Filed 3/27/19

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| In re the Marriage of VIOLET and EVAN BROOKS. | H043467 (Santa Clara County Super. Ct. No. 2009-6-FL-001820) |
| --- | --- |
| VIOLET BROOKS,<br><br>    Appellant,<br><br>    v.<br><br>EVAN BROOKS,<br><br>    Respondent. | |

In this dissolution action, appellant Violet Brooks (Wife) appeals from an order entered after trial on the bifurcated property issue of how to apportion certain stock appreciation. Respondent Evan Brooks (Husband) owned stock in a business he started prior to marriage; the trial court applied the *Van Camp* formula[1] to apportion the appreciation of the stock during the marriage. Utilizing this approach, the court characterized the increased value of the stock after marriage as return on Husband's separate property, finding that Husband did not contribute to the growth of the business after the date of marriage. Wife contends that the trial court erred in rendering that ruling. We disagree and affirm the trial court's order.

---

[1] See *Pereira v. Pereira* (1909) 156 Cal. 1, 7-8 (*Pereira*); *Van Camp v. Van Camp* (1921) 53 Cal.App. 17, 27-28 (*Van Camp*). The two apportionment formulas derived from these cases are discussed more thoroughly below. In brief, under the *Pereira* approach, the court calculates a fair return on the spouse's separate property investment in the business, with the remainder belonging to the community. Under the *Van Camp* method, the court values the spouse's community property efforts devoted to the business, with the remainder constituting separate property income.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2014, the trial court heard evidence on a variety of issues, during which the parties agreed the pivotal issue was the characterization of assets derived from a company known as DigiDesign, which Husband co-founded prior to the marriage. Pursuant to the parties' agreement, the trial court issued a bifurcated ruling on that issue in February 2016, in the form of a "Final Statement of Decision Re Characterization of DigiDesign Adopting a *Van Camp Analysis*." The court based its ruling on the evidence and argument presented during the 28-day court trial. Relevant to the issues on appeal, the court heard testimony from Wife, Husband, Peter Gotcher, Mark Jeffrey, Paul Lego, and expert witnesses David Schultze, James Butera, and Timothy Harper. We glean the following from the record created during the trial.

### A. The Parties' Background

The parties married in June 1989, and separated in March 2009, after nearly twenty years of marriage. They met in 1981 or 1982, shortly after Husband finished college at University of California Berkeley. The parties lived together starting in 1985.

### B. Husband's Role in DigiDesign

In 1983, Husband and his friend, Peter Gotcher, started a company manufacturing replacement sounds on digital chips for digital drum machines. They incorporated the company under the name DigiDesign in 1984, prior to the parties' marriage. Husband and Gotcher each invested $7,000 in capital; the company issued stock, and each founder held shares equally. Husband acquired all of his stock prior to marriage. DigiDesign became known for two "industry-altering products": Sound Tools and Pro Tools, both of which achieved "remarkable and international market success." Gotcher explained that Sound Tools and Pro Tools were "digital audio work stations" that "made it possible to edit [sound] visually," using a computer and computer monitor, "as opposed to the old technique, which was cutting tape with a razor blade." These products became "the new editing paradigm, whereas, splicing tape had been the old one. [¶] Like going from a

2

typewriter to a word processor." As a result of their work, DigiDesign won several awards, including an Oscar and a Grammy. Avid bought DigiDesign in January 1995, for $200 million. Husband's shares of stock in DigiDesign were converted to stock in Avid. At the time of the sale, Husband's stock was worth approximately $38 million.

Gotcher and Husband had different roles within the company. Gotcher ran the business side of the company; he did not have the software coding or hardware skills that Husband possessed. Husband worked on a number of products and related product lines during his tenure with DigiDesign, namely the software component of Sound Tools, called Sound Designer, and its progeny. He held numerous formal and informal titles as well, including vice president, chief scientist, chief technology officer, and director. These titles did not significantly affect Husband's job duties; Gotcher testified chief scientist and chief technology officer were "honorific" with no attendant responsibility. Gotcher served as CEO. While Husband was a director, the Board of Directors did not elect to exercise control over Gotcher's authority to determine the company's products and services.

Husband was the inventor and key software developer of Sound Designer, which went to market in 1984 or 1985, and which was updated approximately 10 times between 1984 and 1989, the year the parties married. Sound Designer was a software application that worked with Apple Macintosh computers to take sounds from a digital sampling keyboard, see them graphically on the computer screen, edit and process the sounds, and send them back to the keyboard for performance. DigiDesign launched Sound Designer II in March 1989; Husband was the key software developer for it as well. Gotcher referred to Sound Designer II as a "mature product," as its predecessor had been on the market for four to five years.

Sound Designer II was the user interface for the product known as Sound Tools, a bundled product containing three to four hardware components and the Sound Designer II software. Sound Designer was an essential component of Sound Tools. Sound Tools

3

shipped in March 1989, prior to the parties' marriage. It was the flagship product for DigiDesign for several years, when another product, Pro Tools, eclipsed it; Gotcher testified Pro Tools exceeded Sound Tools in 1992 or 1993. Husband's primary task after Sound Designer II shipped was supporting the software. Husband designed the prototype for the hardware component of Sound Tools, after which the company delegated the project to other engineers. Husband was not responsible for developing and maintaining the hardware that shipped to customers.

At the time the parties married, Sound Tools was a new product to which the company was still adding features, such that they were in what Gotcher called an "investing" phase. The company continued to modify Sound Tools from 1989 until the release of Pro Tools in 1991. While Husband testified that he did not do a "substantial" amount of work on Sound Tools after the date of marriage, as so much work had already been done prior to its release, Gotcher testified Husband was "heavily involved" in the process. Husband was the key software engineer for the product; if someone reported issues regarding the software, he was the person to call. A team of people worked on the upgrades and improvements, such that Sound Designer became a mix of Husband's algorithms and those of other employees; Husband incorporated the team's work into the application. While Gotcher described Sound Tools as being in the investing phase in June 1989, he said the development of new functionality in Sound Designer was tapering off by that time. Husband contends he spent more time working on other projects from June 1989 to the release of Pro Tools in 1991, rather than working on Sound Designer. DigiDesign released Sound Tools II during the marriage, but it was an "invisible upgrade" using the same Sound Designer II software. At trial, Gotcher opined DigiDesign would not have been successful if Sound Tools was its only product, as it did not have the market potential to grow and generate income in the same way Pro Tools did.

4

Pro Tools provided "a leap in advancement in capability when it was released in August 1991." Where Sound Tools allowed for the editing of only two tracks, Pro Tools introduced multi-track functions, where each track could record and playback independently. Gotcher conceived of Pro Tools and its enhanced features in 1989, around the time Sound Tools shipped. He tasked another DigiDesign employee, Mark Jeffrey, to design and develop Pro Tools in late 1989; it used a different computer language from that used to write Sound Designer II. While the company discussed whether Sound Tools and Sound Designer could become multi-track, they determined they would be better off starting from scratch. Sound Designer was not architected to be a multi-track application, and did not have the correct user interface or real time audio recording and processing engine to be multi-track. Pro Tools had a number of features not available with, or achievable by, Sound Tools. Pro Tools did not use the same software as Sound Tools; they were different platforms.

Although listed as the primary inventor on one of the patents related to Pro Tools, for software essential to Pro Tools' operation, Husband did not participate in the development of Pro Tools' software or hardware. Rather, his role was to maintain Sound Designer II. Husband did not direct or guide Jeffrey's work on Pro Tools; Jeffrey testified he did not consult Husband in the design of Pro Tools in any significant way. A key decision resulting in Pro Tools' success was to provide an open architecture allowing users to use Pro Tools' hardware with third party software and applications, a decision made by Gotcher; Husband was not involved in that decision.

Once released, Pro Tools quickly became DigiDesign's primary product. The revenue Sound Tools generated dropped within a few years of its release; it reached its peak revenue in 1991. By 1992, Sound Tools accounted for 25 percent of the company's revenue. Husband's retained valuation expert David Schultze testified DigiDesign's value would have decreased after the date of marriage had Sound Tools been the only product sold; the increase in value was the result of Pro Tools and had nothing to do with

5

Husband's post-marriage efforts, as his contribution was equal to the contributions made by every employee during that period. Rather, it was Husband's pre-marriage efforts that provided the most value increase, as Sound Tools did contribute prior to Pro Tools' release; Schultze noted Sound Tools was developed and released prior to the date of marriage.

By the time Avid acquired DigiDesign, Sound Tools' revenue comprised 4 percent of DigiDesign's revenue. Sound Tools was part of the reason Avid acquired DigiDesign. Avid was interested specifically in the hardware component of Sound Tools, rather than the Sound Designer software. But the primary reason Avid purchased the company was to acquire Pro Tools, as Avid was already an original equipment manufacturer (OEM) of Pro Tools, using it as an audio component of their systems. Gotcher believed Pro Tools was DigiDesign's most important product at the time of the sale, an opinion shared by Wife's valuation expert, James Butera. Gotcher and Paul Lego, who was DigiDesign's chief operating officer at the time, negotiated the sale to Avid; Husband did not attend negotiation meetings with Avid.

Although Pro Tools did eventually become the company's flagship product, there was a period after its release where it did not do well. Jeffrey testified Pro Tools was "buggy" and described the software as not being "mature in terms of its feature set." DigiDesign used an outside software development team on the very first version of Pro Tools, the results of which Gotcher described as a "disaster" and "train wreck." The trial court found DigiDesign might have "lost the market share" without Husband's continued work on Sound Tools, as Pro Tools was not a market success for several years.

Gotcher testified DigiDesign would not have existed without Husband, because Husband had the technical skills the company needed at its start. The company maintained "key man" life insurance policies on Husband and Gotcher, as well as on Lego. Husband's compensation expert, Timothy Harper, testified that Husband's work at DigiDesign helped create a positive culture, making it one of the best places to work.

6

Gotcher confirmed that the increase in the company's value between the date of the parties' marriage and the date of the sale to Avid was due to "active appreciation," meaning "it was due to activity and things that were going on within the company, new products, new hires . . . versus simply watching it grow on its own passively." Schultze opined that the value increased not because of Husband and his "community efforts," but rather "due to the organization itself, the fact that it was able to raise capital through a Series A, B, C preferred stock; that it has a significant number of employees; that . . . the value is driven by the products that the company has developed and sold, that it doesn't, per se, relate to personal efforts. It's really a product-driven company."

### C. Husband's Work Habits and Salary

From the date of marriage through the sale of DigiDesign to Avid, Husband worked long hours for DigiDesign. Wife testified that he was "always working"; he worked Monday through Friday, and on weekends, getting up early to go to work, and staying "well into dinner or past dinner." Wife described Husband as always being "on," in that "he was always thinking about DigiDesign or working—working on projects for DigiDesign." Husband's work habits did not diminish between the date of marriage and the end of Husband's time working for the company in 1996. Gotcher confirmed that Husband worked "full-time, if not more than full-time" during the relevant period.

Between the date of marriage and the sale of DigiDesign to Avid, Husband received a yearly salary from DigiDesign. He earned $68,412 in W-2 wages in 1989; $90,773 in 1990; $113,429 in 1991; $101,060 in 1992; $119,888 in 1993; and $140,675 in 1994. All witnesses who testified on the subject opined Husband's salary during this period adequately compensated the community for his efforts. Lego, who had oversight of the salaries paid to DigiDesign employees, testified the company used Radford, a "salary benchmarking and survey service," to set salary levels for himself, Gotcher and Husband, as well as all employees. Expert Harper described Radford as being "state of the art"; "they're known for technology, salary compensation studies that are accurate,

7

and they're held in high esteem by companies." Overall, the company maintained salaries that "were kind of right at the midpoint, maybe slightly below the midpoint of the Radford surveys," because DigiDesign was a company people in the industry wanted to work at, so it could afford to be "slightly below the 50th percentile and still attract great employees." Lego described Husband's function at the company between mid-1989 and the end of 1994 as that of a "very high-level . . . contributor engineer" with no management duties; while he was on the board of directors and participated in executive team meetings, he did not take a leadership role.

Although they started the company together, from mid-1989 through the sale to Avid, Gotcher received higher compensation than Husband. Husband knew Gotcher made more money and understood that Gotcher's salary would rise based on what would be expected for a chief executive officer. Husband testified that he was "informed" that his salary was "fairly high" for what he was doing; if he wanted it to continue to rise, he needed to go into management, something he did not like and was not good at. Gotcher believed Husband received fair compensation from 1989-1993. Similarly, Lego also felt Husband received fair compensation during this period; he based his belief on the Radford surveys, as well as "internal equity," comparing Husband to "all the other executives in the company." Lego indicated his opinion Husband received fair compensation also included the fact he had some equity in the company, in addition to his salary.

Harper, Husband's compensation expert, confirmed Husband had minimal if any management duties after marriage, characterizing Husband's job as that of a "software programmer, a senior software guy." "Senior software programmer" is the job description Harper felt best fit Husband's job duties when he did a comparative salary analysis, noting that in technology start-up companies he frequently sees job titles that do not reflect the person's actual duties. While Husband's job title was chief technology officer, after talking with Husband, Harper determined Husband did not have the

8

executive managerial functions he would expect from someone with that title, particularly given that Husband was not involved with Pro Tools. In Harper's opinion, Husband received "competitive" compensation for his services from 1989 to 1994, both inside DigiDesign and compared to other technology start-ups in the nature of DigiDesign. He based his comparison primarily on wages, not including bonuses, commissions, other cash incentives, or stock options; Harper testified he gave more weight to wages because that is generally how start-ups operate, "there's not a lot of money to throw around on profit sharing or even bonuses because companies are cash starved, and even if they make a little money, they don't have a lot to throw around." Harper confirmed that in 1988, "equity interest or equity compensation in the form of stock or stock option was generally a very critical part of an executive's . . . compensation package."

Wife did not offer any contrary expert opinion. Her retained expert, Butera, addressed Husband's compensation as part of his valuation of DigiDesign, but did not do so in an effort to address whether or not Husband's compensation was reasonable; Butera had not qualified as a compensation expert, or consulted with such an expert in his work in this case. Rather, he offered an opinion about "replacement compensation" for Husband in the context of his valuation of DigiDesign at various points in time under the *Pereira* method. While he used figures that were higher than Husband's actual reported salary, Butera stated it was common for the actual salary figures to be "substantially higher or lower" than the figure he used for replacement compensation.

Similarly, Schultze was not specifically retained to offer an opinion as to whether Husband received adequate compensation from DigiDesign in the form of salary and bonuses; he recommended Husband hire a compensation expert to undertake that analysis. Yet, Schultze did testify that he believed Husband was fairly compensated in bonuses and salary, if not overpaid, compared to Jeffrey, who Schultze considered the most comparable employee in terms of job function. Schultze also opined that Husband would have received stock options if he was not a founder of the company, as he was a

9

"key employee." Thus, Schultze believed that had Husband been a regular employee of DigiDesign from 1989 to 1995, he likely would have received stock options, just as Lego and Jeffrey did; because he did not receive such options, Schultze stated Husband was not fairly compensated "[i]n regards to stock options."

## D. The Trial Court's Ruling and Subsequent Proceedings

After issuing a tentative decision and two proposed statements of decision, and receiving additional briefing from the parties, the trial court issued its "Final Statement of Decision Following Court Trial Re Characterization of DigiDesign – Adopting a *Van Camp Analysis*." The court stated at the outset, "After reading the parties' supplemental papers, the Court performed an additional review of the evidence submitted in the trial and concluded that [Husband] has correctly argued the facts and the law. As such, the Court has determined that is must take the *Van Camp* approach." The court included several factual findings relevant to the appeal: ". . .[t]he evidence is clear that Sound Tools was a successful and mature product before the marriage and that Digi Design's [*sic*] growth after the marriage did not stem from extraordinary contributions by [Husband]"; and, "Mr. Schultze and Mr. Timothy Harper, as well as the facts, establish that the community was adequately compensated by [Husband's] earnings during the marriage."

Additionally, the court found, "Although Sound Designer was a relatively mature product when it was released prior to the marriage, [Husband] continued to work on and update Sound Tools which contributed to the continued growth of the company"; "[Husband] was a critical member of DigiDesign, contributing greatly to the company's success during the life of Sound Tools"; ". . . DigiDesign would not have been able to maintain and improve [Sound Tools] without [Husband's] ongoing deployment on Sound Tools during the term of the marriage. . . . If Sound Tools had not been constantly updated, DigiDesign might have lost market share since Pro Tools was not a market success until 1992 and it did not overtake Sound Tools completely until 1994";

10

"Although [Husband] played no role as an executive leader of the company, his skills, time, talents, energy and labor were singularly required to maintain the company's viability until at least 1992 when Pro Tools began to experience success and no later than 1994 when Pro Tools eclipsed Sound Tools as DigiDesign's best selling product"; "[Husband] earned yearly salaries at DigiDesign that ranged from $30,000 in 1989 to $100,000 to $120,000 in 1993."

Finally, in the conclusion of the final statement of decision, the trial court stated, "Based [on] the above findings of fact, the Court is satisfied that it should make an apportionment of the DigiDesign profits between the separate and community estates. . . . [¶] While some evidence supports that [Husband] was important to the company and held an officer's position, he did not play a leadership role in the company. He did not contribute to the company's growth after the date of marriage. That role was fulfilled by others at DigiDesign. Accordingly, the Court adopts a *Van Camp* approach in apportioning the company's growth between [Husband] and the community. The Court finds that the appreciation of the DigiDesign stock was return on [Husband's] separate property—shares that were issued to him before the marriage."[2] The court ordered the parties to proceed before a special master based on its ruling.

Shortly after the court issued its final statement of decision, Wife filed a request for order seeking a certificate of probable cause to appeal the bifurcated ruling. After receiving briefing from both parties, the court held a hearing on the request in March 2016, at which it granted the motion, finding that immediate appeal of the final statement of decision was warranted. In its written order, the trial court ruled that the final statement of decision constituted an order deciding a bifurcated issue in a family law

---

[2] Although the evidence indicates Husband's DigiDesign stock was converted into Avid stock once Avid bought DigiDesign, the trial court refers to the stock at issue as DigiDesign stock. Given the factual circumstances of this case, we will do the same, as it is Husband's efforts prior to the sale of DigiDesign to Avid that are at issue here.

11

matter, thus it granted the motion pursuant to Family Code section 2025 and California Rules of Court, rule 5.392(b) and (c). Within the time established by California Rules of Court, rule 5.392(d), Wife moved this court for permission to appeal, which we granted on May 4, 2016.

## II. DISCUSSION

On appeal, Wife disputes the trial court's decision to use the *Van Camp* method to apportion the increase in the value of Husband's DigiDesign stock post-marriage. She argues the court should have instead used the *Pereira* method, as she contends Husband's post-marriage efforts caused the increase in the company's value. Husband first argues Wife failed to comply with the rules of appellate advocacy, such that she waived any substantial evidence issues. To the extent we consider Wife's contentions, Husband argues it was the efforts of others, not his own efforts, that lead to the increase in the company's value, such that the court correctly used the *Van Camp* method to apportion the increase.

At the threshold, we consider and reject Husband's waiver argument. We then address Wife's arguments on the merits, first describing the standard of review, then summarizing the applicable legal principles, and finally applying those principles to the case before us.

### A. *Rule Violations*

Husband accuses Wife of violating a primary rule of appellate advocacy, requiring the appellant to summarize all material evidence on point in her opening brief, not just the evidence favorable to appellant. He argues that Wife's opening brief constitutes a "one-sided presentation of the evidence." As Husband correctly observes, the parties to an appeal "are required to set forth in their brief all the material evidence on the point and not merely their own evidence." (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881, italics omitted; see *In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1531 (*Davenport*) [reciting only favorable evidence and making an argumentative factual

12

presentation that merely reasserts position at trial "disregards the most fundamental rules of appellate review."].) While Wife's statement of facts emphasizes the evidence favoring her position, we decline to find that she violated the rules of appellate advocacy in doing so, or that any rule violation is so egregious as to warrant forfeiture. We therefore exercise our discretion to disregard any deficiencies in her brief.

## B. *Standard of Review*

We review issues pertaining to the allocation of the community's interest in a spouse's separate property business for abuse of discretion. (*In re Marriage of Brandes* (2015) 239 Cal.App.4th 1461, 1473 (*Brandes*).) "Discretion is abused whenever, in its exercise, the court exceeds the bounds of reason, all of the circumstances before it being considered. The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power. The abuse of discretion standard . . . measures whether, given the established evidence, the act of the lower tribunal falls within the permissible range of options set by the legal criteria. As long as there is a reasonable or even fairly debatable justification for the ruling, we will not set it aside." (*Id.* at pp. 1473-1474, internal quotations and citations omitted.) "Where statement of decision [*sic*] sets forth the factual and legal basis for the decision, any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision." (*Davenport*, *supra*, 194 Cal.App.4th at p. 1531, internal quotations and citations omitted.)

In her briefs, Wife argues we should review the trial court's findings de novo, because the order "rests on undisputed facts."[3] She cites *In re Marriage of Blazer* (2009) 176 Cal.App.4th 1438, 1443, in support of this position, a case in which this court

---

[3] At oral argument, Wife's attorney seemingly conceded abuse of discretion is the appropriate standard of review.

13

determined a spousal support order is generally reviewed for abuse of discretion, but a question of law based on undisputed facts is reviewed de novo. Wife contends the facts on which the trial court based its decision to apply the *Van Camp* method were not in dispute. We disagree. The trial court's ruling in the case before us rests on the disputed factual question of whether Husband's efforts during the marriage contributed to the growth of DigiDesign. The court heard competing evidence on this point. "It is primarily a question of fact for the court to determine what portion of the profits thereafter arises from the use of [the spouse's] (separate) capital and what part arises from the activity and personal ability of the husband." (*Somps v. Somps* (1967) 250 Cal.App.2d 328, 335-336 (*Somps*), internal quotations and citations omitted.) Therefore, we decline to apply the de novo standard of review. We consider the trial court's adoption of the *Van Camp* method of apportionment under the abuse of discretion standard. We review the trial court's factual findings for substantial evidence. (See *Oregel v. American Isuzu Motors, Inc.* (2001) 90 Cal.App.4th 1094, 1100; *Somps*, *supra*, 250 Cal.App.2d at pp. 334-335.) "In so doing, we 'view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor in accordance with the standard of review so long adhered to by this court.' [Citation.] If the record demonstrates substantial evidence in support of the judgment, we must affirm even if there is substantial contrary evidence. [Citation.]" (*Donovan v. Poway Unified School Dist.* (2008) 167 Cal.App.4th 567, 582 (*Donovan*).)

## C. *The Trial Court Did Not Abuse Its Discretion by Selecting Van Camp Method*

### 1. *General Legal Principles*

The parties did not ask the trial court to characterize the stock Husband received for DigiDesign; he earned that stock prior to marriage; clearly it was his separate

14

property.[4]  (See *In re Marriage of Dekker* (1993) 17 Cal.App.4th 842, 850 (*Dekker*).)
"When a spouse's personal efforts increase the value of his or her separate property
business, 'it becomes necessary to quantify the contributions of the separate capital and
community effort to the increase,' because the 'community is entitled to the increase in
profits attributable to the community endeavor.' [Citations.]" (*Brandes*, *supra*,
239 Cal.App.4th at p. 1472.)  Thus, the parties asked the trial court to apportion the post-
marriage increase in the value of Husband's DigiDesign stock between his separate estate
and the community.  The key issue at the bifurcated trial was which method of
apportionment to use—the *Van Camp* method, advocated by Husband, or the *Pereira*
method, advanced by Wife.

"  '*Pereira* is typically applied where business profits are principally attributed to
efforts of the community.'  [Citation.]  'The *Pereira* approach is to allocate a fair return
to the separate property investment and allocate the balance of the increased value to
community property as arising from community efforts.'  [Citation.]  In a *Pereira*
allocation, the court need not 'limit the community interest to a salary as reward for a
spouse's efforts . . . .'  [Citation.]  'To limit the community to compensation received by
way of salary during the marriage would ignore California's egalitarian marriage model
and the apportionment formula of *Pereira* . . .'  [Citation.]  [¶]  'Conversely, *Van Camp* is
applied where community effort is more than minimally involved in a separate business,
yet the business profits accrued are attributed to the character of the separate asset.'
[Citation.]  'The *Van Camp* approach is to determine the reasonable value of the
community's services, allocate that amount to community property and the balance to
separate property.'  [Citation.]" (*Brandes*, *supra*, 239 Cal.App.4th at p. 1473.)

Although courts regularly refer to these two methods of apportionment, we have
not developed a "precise criterion or fixed standard, but have endeavored to adopt that

---

[4] On appeal, Wife conceded Husband's "stake in DigiDesign on the date of marriage was his separate property . . . ."

15

yardstick which is most appropriate and equitable in a particular situation . . . depending on whether the character of the capital investment in the separate property or the personal activity, ability, and capacity of the spouse is the chief contributing factor in the realization of income and profits [citations].” ’ [Citation.] The court ‘ “may select [whichever] formula will achieve *substantial justice* between the parties. [Citations omitted in orig.]” ’ [Citations.]” (*Brandes*, *supra*, 239 Cal.App.4th at p. 1473.) Thus in *Brandes*, the trial court applied both methods, finding *Pereira* applied to an early period in the marriage, and *Van Camp* to a later period; the appellate court upheld this hybrid approach, illustrating the trial court’s broad discretion in choosing the formula that will achieve substantial justice between the parties.

## 2. The Trial Court Did Apportion the Post-Marriage Growth

Wife argues the trial court’s application of the *Van Camp* method did not achieve substantial justice, in that the trial court found the entire appreciation of the DigiDesign stock to be return on Husband’s separate property, based on its finding that Husband’s efforts, and thus, the community’s efforts, did not contribute to DigiDesign’s post-marriage growth. In her opening brief, Wife contends the trial court did not apportion the post-marriage growth at all. Wife is incorrect.[5] The trial court clearly stated, “based [on its] finding of fact, the Court is satisfied that it should make an apportionment of DigiDesign profits between the separate and community estates,” thereafter adopting the *Van Camp* approach to apportionment of the stock appreciation. That approach ultimately led to the court finding that Wife would not receive any additional funds from the money earned from DigiDesign; implicit in this ruling is a finding that Husband’s salary during the marriage reflected the “reasonable value of the community’s services,” such that the remainder of the increase constituted Husband’s separate property. In its final statement of decision, the court explicitly stated that Husband’s experts, “as well as

---

[5] At oral argument, Wife’s attorney acknowledged the trial court did apportion using the *Van Camp* method.

16

the facts, establish that the community was adequately compensated by [Husband's] earnings during the marriage."

Thus, Wife's main concern is not that the trial court did not apportion the post-marriage increase in DigiDesign's stock value, but rather, that it did so in a manner that kept her from receiving any additional funds.

### 3. Substantial Evidence Supports the Finding that Husband was Not the Primary Factor in DigiDesign's Post-Marriage Growth

Although the court made numerous factual findings in its final statement of decision, those most relevant to this appeal are in the court's conclusion. It found that, "[w]hile some evidence supports that [Husband] was important to the company and held an officer's position, he did not play a leadership role in the company. He did not contribute to the company's growth after the date of the marriage. That role was fulfilled by others at DigiDesign." The court thereafter applied the *Van Camp* method of apportionment based on this finding. Wife argues this finding of no contribution on Husband's part to the company's post-marriage growth contradicts other of the court's findings. Certainly, a number of the court's stated findings would support a ruling that Husband did contribute significantly to DigiDesign's growth, notably that Husband was a "critical member" of the company, "contributing greatly to the company's success during the life of Sound Tools," that the company would not have been able to maintain and improve Sound Tools without Husband's ongoing work during the marriage, and that Husband's "skills, time, talents, energy and labor were singularly required to maintain the company's viability until at least 1992 when Pro Tools began to experience success and no later than 1994 when Pro Tools eclipsed Sound Tools as DigiDesign's best selling [*sic*] product." Wife contends substantial evidence supports these findings, all of which she believes reveal the court's error in applying the *Van Camp* method of apportionment rather than that described in *Pereira*.

17

Our concern is not whether substantial evidence supports Wife's position.  If we adopted Wife's proposed de novo standard of review, we would determine anew which apportionment method best affords substantial justice between the parties.  However, as we are reviewing the issue for abuse of discretion, we consider whether the trial court's action fell within the permissible range of options set by the legal criteria.  (*Brandes*, *supra*, 239 Cal.App.4th at p. 1474.)  "We do not review the evidence to see if there is substantial evidence to support the losing party's version of events, but only to see if substantial evidence exists to support the verdict in favor of the prevailing party."  (*Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1245.)  So long as substantial evidence supports the trial court's findings, "it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion."  (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 874, original italics omitted.)  If we conclude substantial evidence supports the trial court's findings, "we *must* affirm" the trial court's ruling.  (*Donovan*, *supra*, 167 Cal.App.4th at p. 582, italics added.)

We agree with Wife that the evidence shows Husband made at least a minimal contribution to DigiDesign's growth after marriage.  However, that conclusion does not compel us to overrule the trial court's decision.  The relevant legal criteria do not require the trial court to find Husband made absolutely no contribution to the increase in value during the marriage in order to apply the *Van Camp* apportionment method.  Rather, the court considers whether Husband's efforts during the marriage were the "chief contributing factor" causing the increase.  (*Brandes*, *supra*, 239 Cal.App.4th at p. 1473.)  In fact, the decision to apportion presupposes that Husband made more than minimal contributions to the separate property business during the marriage.  (See *Beam v. Bank of America* (1971) 6 Cal.3d 12, 17 ["the trial court was compelled to determine what proportion of the total profits should properly be apportioned as community income" where there was no question the husband's "efforts in managing his separate property

18

throughout the marriage were more than minimal."].)  If his contributions during marriage were minimal, the court would not have had to choose a method of apportionment, as there would have been no potential community interest.

While the trial court may have erred in finding Husband made *no* contribution to DigiDesign post-marriage, the record includes substantial evidence demonstrating his post-marriage contributions were not the chief factor in DigiDesign's growth, despite the court's seemingly contradictory findings.  Even if the trial court articulates the wrong reasons when arriving at a correct conclusion, we will presume the judgment correct and affirm it on any ground supported by the evidence, whether articulated by the trial court or not.  (See *Coral Construction, Inc. v. City and County of San Francisco* (2010) 50 Cal.4th 315, 336; *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 18-19.)  Here, substantial evidence supports the trial court's finding that the contributions of others, rather than Husband's contributions, caused the increase in DigiDesign's value after the date of marriage.

Wife argues that *Van Camp* applies only when market forces cause the increase of a separate property business's value during marriage.  She therefore argues it is "irrelevant that 'others at DigiDesign' . . . contributed to its growth during marriage."  She relies heavily on Gotcher's testimony that DigiDesign was an "active" company.  Gotcher confirmed the appreciation was active versus passive, as it was "due to activity and things that were going on within the company, *new products*, *new hires*, all of those things . . . ."  (Italics added.)  However, Gotcher's overall testimony and the testimony of the other witnesses at trial reveal it was the efforts of others in the company, rather than Husband's efforts or market forces, that led to the significant increase in the company's value after the date of marriage.  Wife did not provide contradictory evidence or opinion at trial; Butera, her retained valuation expert, testified only to his valuation under the *Pereira* method, which he performed at Wife's attorney's request, explicitly stating he did not undertake a *Van Camp* analysis.  He did not review the depositions of Husband,

Gotcher, Lego, or Jeffrey in forming his opinions. He had limited information about Husband's job duties or DigiDesign's products and who was responsible for developing the products. He did not know whether Husband contributed to the increase in DigiDesign's sales during the marriage. And, Butera agreed Pro Tools was DigiDesign's most important product in terms of revenue at the time of the sale to Avid, although he did not know whose services were significant in developing the Pro Tools family of products.

As *Brandes* makes clear, the trial court can apply *Van Camp* when the efforts of others within a company cause the increase in value; that approach is not limited to situations where only market forces are at work during the marriage. In *Brandes*, the husband founded an investment advisory services company nine years before meeting the wife; by the date of marriage the company managed $20 million in assets. (*Brandes*, *supra*, 239 Cal.App.4th at p. 1467.) By the date of separation, almost 20 years later, the managed assets were $85 billion; the community estate was worth over $200 million excluding any interest in the company. (*Id*. at p. 1468.) The trial court adopted a "hybrid approach" to apportion the appreciation in assets, finding that the husband's personal efforts were the "primary factor" in the company's growth during the first five years of marriage, justifying the use of the *Pereira* method for that period. (*Id*. at p. 1469.) During that time the husband "was the sole manager of the business; he established [the company's] investing philosophy; he was the central figure in business marketing; his track record attracted investors; and he hired employees, trained them, and directed their activities." (*Ibid*.) For the next period of time, the court applied the *Van Camp* approach, as the company's new CEO and COO proposed changes to the company's investment strategies, which husband was not receptive to at first. They also suggested hiring new managers and changing the management structure, taking decisions away from the husband. These internal factors, as well as other market factors, drove the company's growth after 1991. (*Id*. at pp. 1469-1470.) For the *Van Camp* period, the trial court

found the community had already been "overcompensated" for the husband's services during that period, such that the community was not entitled to any additional funds for that time. (*Id*. at p. 1470.) The Court of Appeal upheld the trial court's apportionment. It did not express concern that factors other than market factors caused the growth during the *Van Camp* period. (*Id.* at p. 1478.)

Here, the trial court modified its ruling after considering *Brandes*, which was decided after the trial court had issued its tentative decision and proposed statement of decision. In its final statement of decision, the trial court said, "In *Brandes*, the appellate court spoke approvingly of the trial court's decision to achieve justice by using a hybrid *Pererira* [*sic*]/ *Van Camp* method. In the present case, the Court initially determined that a singular approach under *Pererira* [*sic*] or *Van Camp* would be unfair to the parties with too stark a result for [Wife] on the one hand or [Husband] on the other. In weighing the evidence presented at trial, however, the Court cannot justice [*sic*] a hybrid approach. There simply is not enough weighty evidence to counter the more robust showing that supports [Husband's] case." Presumably the court found the facts of this case to more closely resemble the *Van Camp* period in *Brandes*, where the husband was not the chief or primary factor affecting the company's growth, despite continuing to contribute more than minimal effort toward that business.

Certainly, the record reveals substantial evidence supporting such a finding. Unlike the husband in *Brandes* during the period in which the trial court applied the *Pereira* approach, Husband was not the sole manager at DigiDesign after the date of marriage. Husband did not have any significant managerial duties after the date of marriage. Husband did not dictate the company's business philosophy; Gotcher was the primary decision maker, making the critical choice to open Pro Tools to third party applications. Husband was a figure in business marketing and his involvement in the company did attract other employees. However, he had minimal involvement in hiring, training, and directing other employees.

21

By comparison, Husband's role in the company after marriage was analogous to that of Mr. Brandes when that court applied the *Van Camp* method of apportionment. While Husband continued to work for the company, his contribution after marriage was more akin to the work done by other senior software engineers in the company. He maintained Sound Designer, but Gotcher testified that a team of employees worked on upgrades and improvements. Sound Tools was at least part of the reason Avid bought DigiDesign, yet the evidence shows Pro Tools was the primary reason for the purchase. Had DigiDesign not developed Pro Tools, the company would not have had the kind of success it did. Substantial evidence supports a finding that Husband did not significantly contribute to Pro Tools. Despite being listed as the chief inventor on a patent related to Pro Tools, the testimony at trial confirmed the company started from scratch when it moved from Sound Tools to Pro Tools; Husband did not contribute to the software or hardware used in Pro Tools. Gotcher came up with the idea and Jeffrey created the software, using a different computer language than Husband used for Sound Designer. Husband did not direct or guide Jeffrey's work on Pro Tools; Jeffrey testified he did not consult Husband in the design of Pro Tools in any significant way. To the extent Pro Tools was built on Sound Tools, the evidence shows it was built on ideas and designs Husband developed prior to the marriage, rather than on work he did during the marriage.

Nor is *Brandes* the only legal precedent applying *Van Camp* when other people, and not just market factors, contributed to the post-marriage growth of a separate property business. In *Somps,* the Court of Appeal upheld a trial court order determining a business the husband owned prior to marriage was entirely his separate property. (*Somps*, *supra*, 250 Cal.App.2d at p. 336.) While the appellate court agreed the community should be compensated for the husband's contribution to the increase in the business after the date of marriage, it upheld the trial court's decision to depart from the *Pereira* method of apportionment, despite the wife's arguments to the contrary. (*Id*. at pp. 335-336.) ". . .[T]here was substantial evidence for the trial court's holding that the

22

increase in the partnership assets or in the value of the stock after the business was incorporated was attributed to a reasonable return upon the separate property of husband invested by him before marriage, and the faithful, loyal and effective services of his partner MacKay and the employees, together with the unprecedented population growth in Santa Clara County, causing an abnormal demand for residential subdivisions and other favorable business factors not related to husband's abilities or labors." (*Id*. at p. 334.) Wife suggests we should distinguish *Somps* from the instant matter as the trial court in *Somps* found the business would have operated just as well without the husband based on the market demand for the single-family homes that constituted the husband's business. Yet, the Court of Appeal did not rest its ruling on market factors alone; it clearly stated the services of the company's employees and the husband's business partner contributed to the growth of the company. Here, the record similarly contains evidence that the efforts of Gotcher and DigiDesign's other employees were the primary factors contributing to the company's growth after the date of marriage, in addition to Husband's continuing contribution, for which he was compensated through salary.

We distinguish the facts of the instant case, as well as those of *Brandes* and *Somps*, from *In re Marriage of Zaentz* (1990) 218 Cal.App.3d 154 (*Zaentz*), a case Wife believes stands for the proposition that the efforts of other people should not factor into the trial court's apportionment decision. In *Zaentz*, the husband, through a production company founded prior to marriage, entered into an agreement during marriage to produce the movie "Amadeus," which became a critical and financial success. (*Id*. at pp. 158-159.) Since the profits contractually inured to the husband's separate property business, he argued wife had no right to any part of the money. (*Id*. at p. 159.) The trial court disagreed; "In awarding wife an equal share of the community interest ($300,000), the court underscored the evidence of husband's unique value to SZC in producing 'Amadeus' and the scope of the community's and husband's investment in 'Amadeus'. . . ." (*Id*. at p. 162.)

23

The trial court in *Zaentz* did not make any findings regarding equitable apportionment. (*Zaentz*, *supra*, 218 Cal.App.3d at p. 166.) The Court of Appeal considered the increased value of the husband's separate stock interest in the company as only one of the factors relevant in awarding wife an equitable share of the community interest. (*Ibid.*) "Husband acknowledges the doctrine of equitable apportionment in connection with the increased value of his separate property stock interest. Under that doctrine, 'since income arising from the husband's skill, efforts and industry is community property, the community should receive a fair share of the profits which derive from the husband's devotion of more than minimal time and effort to the handling of his separate property.' [Citation.]" (*Id.* at pp. 165-166.) The husband argued on appeal that the trial court should have used the *Van Camp* method to apportion the increase in his separate property stock. "However, as wife points out, the trial court made no finding on apportionment and obviously considered the increase in value of husband's stock (or [the company] itself) as only one factor contributing to the actual financial picture. [Fn. omitted.] [¶] From the evidence before it, the trial court could reasonably have believed that without husband's personal efforts in acquiring the film rights, acting as its producer and managing the financial arrangements, there would have been no economic increase in the value of the company. [Fn. omitted.]" (*Id.* at p. 166.)

Wife argues *Zaentz* stands for the proposition that it does not matter that other people contributed to the increase in the value of a spouse's separate property, as the appellate court in *Zaentz* apportioned increased value to the community despite the contributions of others. However, that is not what the opinion says. The trial court did not explicitly apportion the increase; it listed the increase in value as one of several factors it considered in determining the community had an interest in the funds at issue in the case. (*Zaentz*, *supra*, 218 Cal.App.3d at p. 162.) The opinion does not discuss the effect others had on the increase in the stock's value. It simply says the evidence before the trial court supported a finding that there would not have been an economic increase in

the value of the company without the husband's personal efforts. (*Id*. at p. 166.) Here, the evidence suggests that DigiDesign could have still increased in value after marriage without Husband's post-marriage efforts; it was his pre-marriage work that resulted in the company's success prior to the development of Pro Tools.

As substantial evidence supports a finding that Husband and his efforts were not the chief factors in DigiDesign's increase in value after the marriage, we conclude it was within the trial court's discretion to apply the *Van Camp* method to apportion that increase, rather than the *Pereira* method. Given that Husband's most significant contribution to DigiDesign occurred prior to marriage, it was within the permissible range of options for the trial court to determine the *Van Camp* approach would achieve substantial justice between the parties.

### 4. *There is Substantial Evidence Supporting the Finding that the Community was Adequately Compensated*

Where a trial court determines *Van Camp* is the appropriate method by which to apportion the increase in value of a separate property business during marriage, it next determines "the reasonable value of the community's services, allocate[s] that amount to community property and the balance to separate property.' [Citation.]" (*Brandes*, *supra*, 239 Cal.App.4th at p. 1473.) Here the trial court found that Husband's DigiDesign salary during the marriage represented adequate compensation to the community and characterized the remaining increase in the stock value as Husband's separate property. Substantial evidence supports this finding.

Wife on the one hand argues the trial court's application of the *Van Camp* apportionment method ignores Husband's contribution to DigiDesign during the marriage, while on the other hand arguing his salary during the marriage should be irrelevant to the court's determination of which apportionment method to apply. The law is clear that under the *Van Camp* method, where a party's contributions are not the chief factor in the separate property business's growth during the marriage, the trial court still

25

considers the spouse's contribution to the business by looking to his or her compensation during the marriage. (See *Brandes*, *supra*, 239 Cal.App.4th at pp. 1469-1470, 1473; *Somps*, *supra*, 250 Cal.App.2d at pp. 334-336.) As in *Brandes* and *Somps*, the trial court here did exactly as it was required to do once it determined *Van Camp* applied—it looked to whether Husband's compensation reflected a reasonable value for the community's services during marriage.[6]

Wife argues there is no substantial evidence supporting the trial court's finding that Husband's salary served as adequate compensation to the community. In her opening brief, Wife stated that Husband's salary was not "fair" for the community, given that Husband's separate property interest in the company's equity did not "benefit the community." Essentially, Wife claims that the evidence shows the adequacy of Husband's compensation must include consideration of his equity in the company, in addition to his salary. However, substantial evidence supports the trial court's finding that Husband's post-marriage salary fairly compensated him for his post-marriage contributions to the company. The testimony revealed that Husband's main contribution to the company took place prior to marriage, through the creation of Sound Designer and its progeny. The company used a well-regarded salary index to set its salaries; while Lego indicated DigiDesign paid salaries in the mid-range of that index, rather than the

---

[6] While Wife argued in her opening brief that Husband's salary was not relevant to the trial court's evaluation, she clearly did so believing the trial court should have used the *Pereira* approach, under which the court does not consider the spouse's compensation. When a trial court elects the *Pereira* method, it is "not required to find whether [the non-owner spouse's] community property interest was already satisfied by [the owner spouse's] compensation during the marriage. [Fn. omitted.] The court need not 'limit the community interest to a salary as reward for a spouse's efforts . . . .' [Citation.] 'To limit the community to compensation received by way of salary during the marriage would ignore California's egalitarian marriage model and the apportionment formula of *Pereira* . . . .' [Citation.]" (*Patrick v. Alacer Corp.* (2011) 201 Cal.App.4th 1326, 1341.) Because the trial court properly exercised its discretion to select the *Van Camp* method of apportionment, rather than the *Pereira* method, it was required to consider Husband's compensation during the marriage.

higher range, Harper, Husband's compensation expert, agreed Husband's salary was "competitive." After marriage, Husband's job duties matched those of a regular employee, rather than an executive or management level employee. The court did hear testimony indicating that similarly situated companies might have offered regular employees stock options or other compensation in addition to salary, including testimony from Schultze, Husband's own valuation expert. However, Harper testified that, in his opinion, salary should receive a greater weight in the analysis because of the nature of startup companies. Harper did indicate stock options could be a critical component of "executive compensation," however he also testified that Husband's job duties after marriage did not match those of an executive level employee. While the court in its final statement of decision questioned Schultze's credibility, it did not raise any concerns about Harper's, suggesting it gave weight to his testimony and opinions. Wife did not offer contradictory testimony from a compensation expert, as Butera's opinion about Husband's compensation concerned "replacement compensation" for Husband in the context of his valuation of DigiDesign at various points in time under the *Pereira* method.

As substantial evidence supports the trial court's finding that Husband's earnings during the marriage adequately compensated the community for his efforts, we find no abuse of discretion in applying the *Van Camp* method of apportionment to find that the increase in the stock value was Husband's separate property.

### III.    DISPOSITION

We affirm the trial court's order.

27

_____
Greenwood, P.J.

WE CONCUR:


_____
 Grover, J.




_____
 Danner, J.




Brooks v. Brooks
No. H043467

Trial Court:                           Santa Clara County Superior Court
                                       Superior Court No.: 2009-6-FL-001820

Trial Judge:                           The Honorable Erica Yew


Attorneys for Appellant,               REED SMITH LLP
VIOLET BROOKS:                         Paul D. Fogel
                                       Dennis Peter Maio

                                       LAW FIRM OF J. HECTOR MORENO,
                                       JR. & ASSOCIATES
                                       J. Hector Moreno, Jr.
                                       J. Michael Sean Onderick

                                       WESTOVER LAW GROUP, A.P.C
                                       Andrew L. Westover

Attorneys for Respondent,              BAUGH & AMINI
EVAN BROOKS:                           Bradford Baugh

                                       Garrett C. Dailey

Brooks v. Brooks
H043467