Filed 4/16/21  Marriage of B.K. and L.S. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of B.K. and L.S. | D077408 |
| B.K.,<br><br>    Appellant,<br><br>    v.<br><br>L.S.,<br><br>    Respondent. | (Super. Ct. No. 17FL000940C) |

APPEAL from an order of the Superior Court of San Diego County, Lisa R. Rodriguez, Judge.  Affirmed in part and remanded in part with directions.

Rosemary Meagher-Leonard for Appellant.

Bickford Blado & Botros and Andrew J. Botros for Respondent.


B.K. (Father) appeals from a family court order granting the request of L.S. (Mother), a Hungarian native, to move to Hungary with the parties' two

minor children, J.K. and K.K.[1]  The children, who are dual citizens of the United States and Hungary, were nine and seven years old at the time of the order.  The court awarded Father with visitation rights and imposed conditions, known as "*Condon*[2] conditions," to ensure enforcement of the child custody order once Mother moves to Hungary with the children.

Father argues the court abused its discretion in allowing the international move because, according to Father, the court misapplied the relevant law on move-away requests and its findings are not supported by substantial evidence.  Father also argues the court failed to impose adequate *Condon* conditions to protect his visitation rights with the children once they relocate, including by failing to require that Mother post a cash bond and file a stipulation in Hungary conceding to U.S. jurisdiction.

Mother argues a bond was not required but she has no objection to a modified order requiring her to forfeit some child support to ensure enforcement of the court's orders.  Because some type of alternative financial sanction is typically imposed in international relocation cases and Mother has no objection to such an order here, we remand the cause to the family court to modify its order requiring Mother to forfeit some child support as an enforcement mechanism.

In other respects, finding no abuse in permitting the children to move with Mother to Hungary, we affirm.

---

[1]     Pursuant to the California Rules of Court, rule 8.90, governing "Privacy in opinions," we refer to the parties and children by first and last initials only.

[2]     *In re Marriage of Condon* (1998) 62 Cal.App.4th 533 (*Condon*).

2

## FACTUAL AND PROCEDURAL BACKGROUND

Mother immigrated from Hungary to the United States when she was thirty-nine years old. Soon after she arrived, she married Father in November 2009. In July 2010, their daughter J.K. was born in Florida. When J.K. was three months old, the young family moved to San Diego, California because of Father's work. In December 2012, their son K.K. was born in San Diego. Before their eighth wedding anniversary, Mother and Father separated and, in early 2017, Father moved back to Florida while Mother and the children remained in San Diego.

A stipulated judgment of dissolution of marriage was entered April 13, 2017. Pursuant to the judgment, the parties shared legal custody, Mother was awarded physical custody of the children in San Diego, and Father would have visitation that was approximately a 5 percent timeshare. Over the next several years, the parties would litigate child custody and visitation numerous times in court. Mother retained physical custody, but Father's timeshare with the children increased to an approximate 25 percent timeshare.

In October 2019, Mother, as a self-represented litigant, filed a request for order (RFO) seeking to move the children with her to Budapest, Hungary. Mother stated she received a job offer in Budapest as the reason for the move. Father opposed the move and sought sole physical custody to move the

children to Boynton Beach, Florida to live with him. At a contested evidentiary hearing in January 2020, Mother and Father each testified.[3]

Mother has been the children's primary caregiver since birth. She was the stay-at-home parent during the nearly eight-year marriage, while Father was not very involved in the children's day-to-day life because of his work. When Father moved to Florida in early 2017, she had physical custody of the children. At the time of the hearing, Father "on an average" saw the children "probably every other month." He exercised visitation with the children for "the big vacations" but did not know if he had "exercised the full 28 days that was allotted" to him each year. Father described his early relationship with the children as "[e]xtremely limited" and "constrained" because the children only spoke Hungarian and he does not. However, the parties agreed Father's relationship with the children was improving as they had matured.

Mother wanted to move to Hungary to pursue an executive job opportunity, which she believed would materially improve the children's lives. The children, who have been immersed in Hungarian culture all their lives, speak Hungarian, eat Hungarian food, and have dual citizenship in the United States and Hungary. In San Diego, they attend a Hungarian American school, participate in an international school program, act in American-Hungarian bilingual musicals, and are members of the Hungarian Scout program. In Budapest the children would attend a private American school with other American children and they would be cared for by an

---

[3]　We summarize the evidence, as necessary to the disposition of the appeal, under the applicable standard of review discussed in part I., *post*. We view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor. (*In re Marriage of Brooks* (2019) 33 Cal.App.5th 576, 588 (*Brooks*).)

American doctor. The children would have family, including maternal grandfather and cousins, in Hungary and Europe. They would also have existing friends because some of their Hungarian friends in San Diego were also moving to Hungary.

Mother would encourage the children's relationship with Father by facilitating communications and flying them to Florida, or wherever Father designated, for their summer breaks with Father. Based on Mother's research, the flights between Florida and Hungary cost approximately $500 and while the duration depends on connections, flight time from Orlando or Miami is approximately six or seven hours.

Mother acknowledged she had filed multiple RFOs seeking to obtain sole legal custody of the children in 2017 and 2018 and she had been sanctioned by the court in late 2017. When questioned by the court about her past litigiousness, Mother explained she was upset and "grieving" after the divorce. She felt "alone" in making all the decisions for the children because Father was not involved, and she believed it would be best for the children if she exercised sole legal custody. Over time she "accepted the situation" and learned to co-parent with Father.

Father believes Mother is "opposed" to his relationship with the children and has repeatedly sought to take custody of the children. Father claimed Mother is moving to Hungary because it has a "more favorable legal system" where Mother will be able to wrest custody from him. Father does not believe the children would do well in Hungary; he emphasized that because the children are Hungarian-American, and not Hungarian natives, they would experience challenges in being accepted.

Father believes the mere distance between Florida and Hungary would "severely" limit his ability to see the children because of the cost and travel

5

time. According to Father, flights from Florida to Hungary cost approximately $1,000 or more, and travel time is "more like 20 hours" with layovers, connections, and international customs. Father was concerned that the cultural, language, and geographic barriers he would face in Hungary would limit his ability to see the children. He was also concerned that his "access" to the children would be impacted by a Hungarian legal system that would not "respect" his parental rights.

After hearing the evidence and arguments, the court weighed the factors under *In re Marriage of LaMusga* (2004) 32 Cal.4th 1072 (*LaMusga*) and *Condon, supra,* 62 Cal.App.4th 533, and concluded it was not in the children's best interest to transfer physical custody from Mother to Father. The court granted Mother's request and permitted the children to move with her to Hungary. The court issued the following parenting plan upon the children's relocation: parties would share legal custody, Mother would have primary physical custody, and Father would have parenting time with the children during the spring, summer, and winter breaks, in either Florida or Hungary, and the option of an additional 24 days each year in Hungary. The court also imposed *Condon* conditions to ensure enforcement of the parenting plan once Mother and the children move to Hungary.

On March 4, 2020, the court entered a Findings and Order After Hearing (FOAH). Father appealed.[4]

---

[4] Father filed his notice of appeal from a January 28, 2020 minute order granting Mother's move-away request. We construe Father's premature notice of appeal as taking the appeal from the court's March 4, 2020 FOAH. (Cal. Rules of Court, rule 8.104(d).)

## DISCUSSION

### I.

### *Standard of Review*

International move-away orders are one of the more difficult decisions family courts are asked to make, particularly where, as here, they involve equally loving parents.  They require family courts to navigate the irreconcilable tension between a parent's desire to move with the child, the child's need for stability, and the interests of the child in maintaining regular contact with both parents.  (*LaMusga*, *supra*, 32 Cal.4th at p. 1101.)  Whatever decision is made, there is frequently no solution that will satisfy everyone involved because the order will result in the child and a parent being placed in different countries, often on different continents and multiple time zones apart.  Because move-away cases involve "heart-wrenching circumstances," our Supreme Court has emphasized that "this area of law is not amenable to inflexible rules" and "we must permit our superior court judges . . .  to exercise their discretion to fashion orders that best serve the interests of the children in the cases before them."  (*Ibid*.)

We reverse the family court's order only where the appellant has shown the court has abused its discretion by unreasonably concluding that its order was in the best interests of the children.  (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32 (*Burgess*); *In re Marriage of Abargil* (2003) 106 Cal.App.4th 1294, 1298-1299 (*Abargil*).)  As a reviewing court, we presume the move-away order is correct (*In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 93-94) and we evaluate the family court's determination with cautious restraint.  The burden is on Father, as the appellant, to establish an abuse of discretion.  (*In re Marriage of Brandes* (2015) 239 Cal.App.4th 1461, 1473-1474.)

Because it is Father's burden to affirmatively demonstrate error, he must provide citations to the appellate record directing the court to the evidence supporting each factual assertion. (Cal. Rules of Court, rule 8.204(a)(1)(C).) He must also set forth an adequate "summary of the significant facts *limited to matters in the record*." (Cal. Rules of Court, rule 8.204(a)(2)(C), italics added.) In doing so, he must set forth all material facts and evidence, including facts and evidence *damaging* to his position. (*Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1408; *In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1531 [reciting only favorable evidence and making an argumentative factual presentation that merely reasserts position at trial "disregards the most fundamental rules of appellate review."].)

Mother contends Father has violated these well-established rules of appellate advocacy and, consequently, she argues, Father has forfeited any argument that the family court's order lacks substantial evidence. We agree that Father has failed to comply with these rules. He presents a one-sided presentation of the evidence, omits reference to evidence damaging to his position, and states findings not made by the family court. Father's counsel repeatedly refers to alleged facts that do not appear in the record on appeal and that allegedly occurred *after* entry of the appealable order. Counsel is reminded that "[i]t has long been the general rule and understanding that 'an appeal reviews the correctness of a judgment as of the time of its rendition, upon a record of matters which were before the trial court for its consideration.' [Citation.]" (*In re Zeth S.* (2003) 31 Cal.4th 396, 405.) We therefore disregard any reference to facts outside the record on appeal.

Although the deficiencies in Father's statement of facts arguably justify a finding of forfeiture, we exercise our discretion to disregard the violations

8

and address the merits of the appeal.  (*Brooks*, *supra*, 33 Cal.App.5th at p. 588.)

## II.

### *Analysis*

On appeal, Father argues the family court abused its discretion in allowing the children to move to Hungary with Mother.  Specifically, Father argues the court misapplied the relevant law on move-away requests, its findings are not supported by substantial evidence, and the court failed to adequately protect his visitation rights with the children upon their relocation to Hungary.

### A.    *Legal Principles Governing A Move-Away Request*

When a parent who has sole physical custody under an existing judicial custody order seeks to relocate a child, he or she " 'has the right to change the residence of the child, subject to the power of the court to restrain a removal that would prejudice the rights or welfare of the child.' " (*Burgess*, *supra*, 13 Cal.4th at p. 29 (quoting Fam. Code,[5] § 7501).)  Because of this presumptive right to change the child's residence, the custodial parent bears no burden of establishing that the planned move is " 'necessary.' " (*Burgess*, *supra*, at p. 29; *LaMusga*, *supra*, 32 Cal.4th at p. 1078.)

The presumption shifts the burden to the noncustodial parent to show the move would cause detriment to the child, requiring the court to reevaluate the child's custody.  (*LaMusga*, *supra*, 32 Cal.4th at p. 1078.)  The likely impact of the move on the noncustodial parent's relationship with the child is relevant in determining whether there is detriment and, while it may be sufficient to justify a change in custody when considered with all relevant

---

[5]    Unspecified statutory references are to the Family Code.

9

factors, detriment alone does not mandate a change in custody. (*Id.* at p. 1095.) Rather, it requires the family court to perform "the delicate and difficult task" of determining whether a change in custody is in the child's best interests. (*Id.* at p. 1078.)

The burden of demonstrating a change in circumstance requiring a change of custody is on the noncustodial parent. (*Burgess, supra*, 13 Cal.4th at p. 37.) " '[I]n view of the child's interest in stable custodial and emotional ties, custody lawfully acquired and maintained for a significant period will have the effect of compelling the noncustodial parent to assume the burden of persuading the trier of fact that a change [in custody] is in the child's best interests.' " (*Ibid.*, quoting *Burchard v. Garay* (1986) 42 Cal.3d 531, 536 (*Burchard*).) Otherwise, the court " 'should preserve the established mode of custody.' " (*Burgess, supra*, 13 Cal.4th at pp. 37-38, quoting *Burchard, supra*, 42 Cal.3d at p. 535.)

In determining whether to modify an existing custody order in light of the custodial parent's request to move the child's residence, the family court is required to consider what has become known as the *LaMusga* factors. (*LaMusga, supra*, 32 Cal.4th at p. 1101.) These include: "the children's interest in stability and continuity in the custodial arrangement; the distance of the move; the age of the children; the children's relationship with both parents; the relationship between the parents including, but not limited to, their ability to communicate and cooperate effectively and their willingness to put the interests of the children above their individual interests; the wishes of the children if they are mature enough for such an inquiry to be appropriate; the reasons for the proposed move; and the extent to which the parents currently are sharing custody." (*Ibid.*)

10

Additional "unique factors [are] added to the equation" when the proposed relocation is to a foreign country. (*Condon*, *supra*, 62 Cal.App.4th at pp. 541-542.) In international move-away requests, the court must also consider: (1) any significant cultural problems, such as different accepted social norms or practices, language barriers, or restrictions on freedoms and rights guaranteed in the United States; (2) distance problems, such as any accompanying expense or jet lag with international travel; and (3) jurisdictional problems concerning the enforceability of the California order in the foreign jurisdiction. (*Id.* at pp. 546-547.) To minimize the jurisdictional problems, the court should order procedural safeguards to ensure the relocating parent complies with its orders and does not seek to invalidate or modify them in a foreign court. (*Id.* at pp. 547-548.)

B.    *The Family Court Reasonably Concluded It Was in the Children's Best Interest to Move to Hungary with Mother*

Our review of the record establishes that the family court followed the appropriate procedures and correctly applied the appropriate standards in granting Mother's move-away request. The court's conclusion that it was in the children's best interest to move with Mother, their primary caregiver since birth, to a country where they spoke the language, understood the culture, and had dual citizenship, was well within the bounds of reason and controlling law, and amply supported by substantial evidence. Rather than demonstrating abuse, Father's arguments on appeal are essentially his disagreements with the court's factual findings and determination of what was in the children's best interest. He reargues the facts as he would have them and merely reasserts his positions in the family court. As we discuss, Father misunderstands our role on appeal and ignores the governing standard of review.

11

The court correctly began its analysis with the presumption that Mother, as the parent with sole physical custody of the children, had the right to change the children's residence. (§ 7501; *Burgess, supra*, 13 Cal.4th at p. 29.) The presumption required Father to make the initial showing that the move would cause detriment to the children, requiring the court to reevaluate the children's custody. (*LaMusga, supra*, 32 Cal.4th at p. 1078.) The court, agreeing with Father that the "6000-mile move" would result in a "de facto termination" of Father's relationship with the children "to some degree," concluded Father had rebutted the presumption.

Next, the court carefully considered *each* of the *LaMusga* and *Condon* factors and concluded, on balance, that Father had not shown that it would be in the children's best interest to transfer physical custody from Mother to Father. (*LaMusga, supra*, 32 Cal.4th at p. 1101.) At the outset, the court noted that irrespective of how it ruled, "the children will be moving from their current community, either with the custodial parent to Hungary or the noncustodial parent to Florida." Thus, whatever decision the court made, there could only be one custodial parent, and the children would be separated from the noncustodial parent by several thousand miles. Within that context, the court undertook "the delicate and difficult task" of determining whether to change the children's existing custodial arrangements. (*Id.* at p. 1078.)

In balancing the various factors, the court found the children's interest in stability and continuity "weigh[ed] heavily" against changing their custodial parent to Father. The court found that Mother was the children's primary caregiver since birth and "the children have not gone any significant period of time without [her]." She has had "primary" physical custody for the last three years since the parties separated. Although Father "played an important role in their care" and "tries to visit regularly," the court found

that he has "gone for multiple months without in-person parenting time" with the children.

The court found the children's relationship with both parents also weighed against changing their custodial parent to Father. The children were primarily attached to and bonded with Mother, while Father's relationship with the children was "improving" from a "highly limited and constrained" one during their younger years.

The evidence supporting the court's findings on these factors was overwhelming and is not disputed by Father. Instead, Father's chief complaint is that the court "prioritized" and "gave greater weight" to the stability and continuity of the children's relationship with Mother than the "probable" or " 'de facto' " termination of their relationship with Father. He argues the court failed to properly consider the impact of the proposed distance and complexity of international travel on Father's relationship with the children and the children's interest in meaningful contact with both parents.

The court, however, is entitled to give whatever weight it deemed appropriate to any of the *LaMusga* factors in determining the children's best interest. (*LaMusga*, *supra*, 32 Cal.4th at p. 1093 ["The weight to be accorded to such factors must be left to the court's sound discretion."].) Moreover, our high court affirms what the family court concluded: " 'the paramount need for continuity and stability in custody arrangements—and the harm that may result from disruption of established patterns of care and emotional bonds with the primary caretaker—*weigh heavily* in favor of maintaining ongoing custody arrangements.' " (*LaMusga*, at p. 1093, quoting *Burgess*, *supra*, 13 Cal.4th at pp. 32-33, italics added.) In this case, "[t]he hurdles to meaningful contact that [Father] identifies cut both ways because they exist whichever

13

direction one goes." (*Abargil*, *supra*, 106 Cal.App.4th at p. 1300.) Given only a binary choice of placing "6000 miles" between the children and Mother *or* the children and Father, the court was within its discretion to conclude it was in the children's best interest to stay with their primary caregiver.

Contrary to Father's assertions, the court did not "dismiss[ ]" or "ignore[ ]" the impact of the international move on his relationship with the children. It considered the burden and cost on Father of international travel involving children who could not fly unaccompanied. The court weighed that burden with the fact that there was already currently 2000 miles between Father and the children, both of whom have not lived in the same state for the last three years. The court found Father was employed, flights from Florida to Hungary are more expensive and less likely to be covered by Father's employer, but the parties were already incurring the time and expense of traveling across country for parenting time. We reasonably infer the court concluded that international travel was not so cost prohibitive that it would preclude Father from seeing the children. (*Brooks*, *supra*, 33 Cal.App.5th at p. 588 [reasonable inferences will be drawn from the facts in support of the trial court's determination].) Despite Father's complaints, the court also concluded that distance weighed "ever so slightly" *in favor of changing custody to Father* under both *LaMusga* and *Condon*.[6]

---

6    We note there is a conflict between the reporter's transcript and the FOAH. Based on the reporter's transcript, the court found distance weighed slightly in favor of changing custody to father under both *LaMusga* and *Condon*. The FOAH states the court found distance was a "neutral factor" under *LaMusga* but weighed "slightly in favor" of modification of the custodial parent under *Condon*. Whether distance was a "neutral factor" or weighed "slightly in favor" of Father does not change our analysis or conclusion that the court did not abuse its discretion.

14

Still Father argues the court "completely ignored" the additional analysis of distance required under *Condon*, *supra*, 62 Cal.App.4th at 546-548, and failed to put Mother to her burden of showing that the "de facto" termination of Father's relationship with the children would be in the children's best interests. Father misstates the court's findings and misstates *Condon*.

The court in *Condon* observed that: "For *a person of average income or below*, an order relocating his or her child to a faraway foreign country is ordinarily tantamount to an order terminating that parent's custody and visitation rights." (*Condon*, *supra*, 62 Cal.App.4th at p. 547, italics added.) "*[E]xcept for those of considerable means*, any relocation to another continent is likely to represent a de facto termination of the nonmoving parent's rights to visitation and the child's rights to maintain a relationship with that parent." (*Ibid.*, italics added.) "Thus, when a relocation would have this practical effect, before allowing the move-away a trial court should require the moving parent to satisfy the burden of showing the termination of those rights would be in the best interests of the child." (*Ibid.*)

Assuming a parent with sole physical custody under an existing judicial custody order bears such a burden,[7] in citing *Condon* for that proposition, Father omits the court's repeated qualifications that it is the lack of financial

---

[7] Our high court made clear that the burden in a move-away case is squarely on the noncustodial parent remaining behind, not the custodial parent seeking a relocation, to demonstrate the move is not in the child's best interest. (*Burgess*, *supra*, 13 Cal.4th at pp. 37-38; *Abargil*, *supra*, 106 Cal.App.4th at pp. 1298-1299 ["As the noncustodial parent with visitation rights, [Father] carries the burden of proving [Mother's] decision to move is not in [the children's] best interests; the burden is not on [Mother] to prove the contrary."].)

15

resources, and not mere distance, that may have the practical effect of terminating the nonmoving parent's rights and relationship with the children. In any event, the court considered the burdens and costs of international travel and did not find either resulted in a de facto termination of Father's relationship with the children.

Father argues the court "disregarded" Mother's "prior litigious history" and past attempts to interfere in his relationship with the children by *believing* Mother's "unsubstantiated promises, inconsistent testimony, and fabricated employment reasons." He argues that by doing so the court failed to appreciate that Mother was "unlikely" to facilitate continuing contact between him and the children, compounding the enforceability problem of an international relocation identified in *Condon, supra*, 62 Cal.App.4th at pages 547-548.

Father's arguments disregard the governing standard of review. The determination of "[w]hat constitutes the best interest of a child presents an inherently factual issue." (*Guardianship of A.L.* (2014) 228 Cal.App.4th 257, 268.) We defer to the family court's adjudication of facts. (*Condon, supra*, 62 Cal.App.4th at p. 549.) We do not reweigh the evidence or assess the credibility of witnesses. (*Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1246 (*Babick*).) We review the family court's factual findings for substantial evidence, viewing the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor. (*Brooks, supra*, 33 Cal.App.5th at pp. 588-589.) Importantly, and overlooked by Father, " '[w]e do not review the evidence to see if there is substantial evidence to support the losing party's version of events, but only to see if substantial evidence exists to support the verdict in

16

favor of the prevailing party.' [Citation]." (*Id.* at p. 592, quoting *Babick, supra,* 229 Cal.App.4th at p. 1245.)

The court did not disregard Mother's prior litigious history or Father's allegations of Mother's past interference; it merely resolved those factual issues differently than Father advocated. The court weighed the evidence and found both parents had engaged in "high conflict" and both "demonstrated resistance to negotiation or positive communication" but they were recently able to work together to co-parent the children. The court expressed its concerns about Mother's desire to parent alone but believed Mother was trying to overcome that desire and to value and support Father's role in the children's life. The court believed Mother's testimony that she would make the children available to Father and she would contribute financially to travel costs with her new employment.

The court further concluded there was no evidence that Mother would not comply with its order. The court considered and rejected Father's allegation that Mother "threatened to kidnap" the children, including in a January 2017 email, stating: "The court does not make that finding. One text message or one message between the parents I don't find very persuasive, especially noting that it was multiple years ago." The court found persuasive that Mother has never tried to physically remove the children from Father despite Father living 2000 miles away. Instead, Mother "waited to go through the process to lawfully move." Accordingly, the court concluded "[t]here's simply nothing to suggest that [Mother is] at greater risk" of not complying with the court's custody and visitation order.

The court's findings are supported by substantial evidence. Testimony from a single witness, even a party, is sufficient to support the family court's findings. (*In re Cheryl E.* (1984) 161 Cal.App.3d 587, 598.) The court's

17

conclusion is also within the bounds of reason and law. (*J.M. v. G.H.* (2014) 228 Cal.App.4th 925, 929 (*J.M.*) [family court's order permitting child to relocate to Israel despite evidence of mother's noncompliance with prior custody agreements because "there was no showing that [mother] would not comply with future orders" affirmed].) However strongly Father disagrees, the court was entitled to adjudicate the facts as it saw appropriate, given its observations of both parties' testimony and demeanor, and we do not reweigh the evidence on appeal.

In sum, we find no abuse in the court's granting of Mother's move-away request.

C.      *The Family Court Imposed Adequate Protective Measures to Ensure Enforceability of Its Orders*

"California court orders governing child custody lack any enforceability in many foreign jurisdictions and lack guaranteed enforceability even in those which subscribe to the Hague Convention on the Civil Aspects of International Child Abduction." (*Condon, supra,* 62 Cal.App.4th at pp. 547-548.) Thus, the *Condon* court held that "before permitting any relocation which purports to maintain custody and visitation rights in the nonmoving parent, the trial court should take steps to insure its orders to that effect will remain enforceable throughout the minority of the affected children." (*Condon, supra*, 62 Cal.App.4th at p. 547.) To accomplish this result, "the court will be required to use its ingenuity to ensure the moving parent adheres to its orders and does not seek to invalidate or modify them in a foreign court." (*Id.* at pp. 547-548.)

In this case, Father requested that the family court require Mother to register the court's custody order in Hungary, designate an agent for service of process in the United States, stipulate she would not seek to modify the

custody order in Hungary, and post a bond for attorney's fees in the event Father is required to litigate child custody in a foreign court.

With the exception of the bond, the court imposed the very conditions requested by Father, and added several more protective measures. The court declared California would cede UCCJEA[8] jurisdiction to Florida to determine child custody and child support, ordered Father to register the court's order with Florida, and ordered Mother to designate an agent for service of process in Florida for matters related to child custody and visitation. The court ordered Mother enjoined from filing any action to modify child custody and visitation in any jurisdiction other than Florida. It further ordered Mother to register California's judgment in Hungary, acknowledging California had jurisdiction to make the order; to register annually the court's custody and visitation order under the Hague Convention on Civil Aspects of Child Abduction (Hague Convention) in Hungary; to file a declaration annually in Hungary acknowledging the children's habitual residence is Florida; and to waive extradition to the United States if she is charged with parental kidnapping pursuant to federal law.

---

8    Uniform Child Custody Jurisdiction and Enforcement Act (§ 3400 et seq.).

Father argues the court abused its discretion by not ordering Mother to file a stipulation consenting to jurisdiction in the United States and to post a cash bond.[9] We disagree.

First, the court imposed several protective measures "to ensure [that Mother] adheres to its orders and does not seek to invalidate or modify them in a foreign court." (*Condon, supra,* 62 Cal.App.4th at pp. 547-548.) It ordered Mother enjoined from initiating modification anywhere other than Florida, to designate an agent for service of process on child custody and child support matters in Florida, to register the custody order in Hungary and to file declarations annually attesting to Florida as the children's habitual residence. Mother agreed to these conditions under oath. Although the court could have made explicit that Mother file a written stipulation consenting to the continuing jurisdiction of the United States, the enforcement conditions imposed accomplish the same result.

Second, *Condon* suggested that sanctions to enforce the moving parent's concession to United States jurisdiction "should include the posting of an adequate monetary bond *within [the moving parent's] means.*" (*Condon, supra,* 62 Cal.App.4th at 562, italics added; *J.M., supra,* 228 Cal.App.4th at 934 [rejecting father's argument that "the absence of a bond is fatal"].) Here, the court denied Father's request that Mother post a bond based on her "lack

---

9     Father also argues the court erroneously relied on the Hague Convention and the court should have denied Mother's request to move the children because Hungary does not abide by the UCCJEA. It is because of the jurisdictional problems that arise from the fact that foreign countries are not signatories to the UCCJEA and that the Hague Convention offers only limited protection that courts must consider which enforcement conditions to impose pursuant to *Condon.* (*Condon, supra,* 62 Cal.App.4th at pp. 556-558, 561-562.)

of income" since her reason for the move was to obtain employment. The court concluded that requiring Mother to post a cash bond before the move would be "prohibitive of the relocation." Substantial evidence supported the court's findings that Mother did not have the means to post the bond before relocation and Father did not request the family court impose any alternative financial sanction.

On appeal, Mother argues a bond is not required in every case but she has no objection to a modified order requiring her to forfeit some child support in the event of a violation of the custody order. Because some alternative financial sanction is typically imposed in international relocation cases and Mother has no objection to such an order here, we remand the cause to the family court to modify its order to include Mother's forfeiture of child support as an enforcement mechanism. While we leave it to the court's discretion to fashion the amended order on remand, including the amount of child support to be forfeited, Father should not be permitted to unilaterally terminate or reduce support payments because he believes Mother has violated the court's orders. Rather, he should only be allowed to petition the family court for such relief. (*Condon*, *supra*, 62 Cal.App.4th at p. 562.)

## DISPOSITION

The family court's child-custody and move-away order, as set forth in the FOAH filed on March 4, 2020, is affirmed in part and the cause is remanded to the court with instructions that it amend its order to impose a reasonable sanction that Mother forfeit some child support payments upon proof she is violating the terms of the court's orders, consistent with this opinion. In all other respects, finding no abuse in permitting the children to move with Mother to Hungary, we affirm. Each party shall bear his or her own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

DO, J.

WE CONCUR:

HUFFMAN, Acting P. J.

GUERRERO, J.

22