Filed 5/17/23  In re Mar.D. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| In re Mar.D. et al., Persons Coming Under the Juvenile Court Law. | D081304 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>M.D. et al.,<br><br>    Defendants and Appellants. | (Super. Ct. Nos. J520405A, C) |

APPEALS from orders of the Superior Court of San Diego County, Browder A. Willis III, Judge.  Conditionally reversed and remanded with directions.

Marisa L. D. Conroy, under appointment by the Court of Appeal, for Defendant and Appellant, K.J.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant, M.D.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Eliza Molk, Deputy County Counsel, for Plaintiff and Respondent.

K.J. (Mother) and M.D. (Father) (collectively, the parents) appeal from juvenile court orders terminating parental rights to their sons, Mar.D. and My.D. (collectively, the children). (Welf. & Inst. Code,[1] § 366.26.) The parents make two contentions on appeal: (1) the juvenile court erred by finding the beneficial parent-child relationship exception to the statutory preference for adoption did not apply (§ 366.26, subd. (c)(1)(B)(i)); and (2) the San Diego County Health and Human Services Agency (Agency) failed to comply with their inquiry duties under the Indian Child Welfare Act (ICWA, 25 U.S.C. § 1901 et seq). As explained below, we conclude the juvenile court did not err by finding the beneficial parent-child relationship exception did not apply to preclude the termination of parental rights. However, we agree that the Agency failed to fulfill their duties of inquiry under ICWA, and we conditionally reverse the orders terminating parental rights for the limited purpose of compliance with ICWA and its related statutory provisions.

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

2

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Events Leading to Dependency*

In May 2020, the parents' three children, Mar.D., My.D., and Mas.D.,[2] came to the Agency's attention when My.D.'s urine tested positive for cocaine shortly after his birth. My.D. exhibited symptoms of in utero cocaine exposure, including a low birth weight. Mother admitted to hospital staff that she used cocaine while two-year-old Mas.D. and four-year-old Mar.D. played outside during her pregnancy with My.D. She also disclosed that she was diagnosed with "Bipolar I disorder," and she was not participating in treatment to address her mental health issues. Father informed a social worker he was recently out of town for work and that he was unaware of Mother's drug use.

The Agency prepared a safety plan that prohibited Mother from using drugs or being left alone with the children. After Mother and My.D. were discharged from the hospital, the parents violated the safety plan within two weeks of its implementation by leaving Mother alone with the children while Father was away at work. Mother was offered resources to address her substance abuse and mental health issues, but she did not enroll in the services. Neither parent participated in a scheduled "family team meeting" and Father told the Agency he would not cooperate, stating, "Get a court date. I'll do what a judge tells me but until then I'm not." He also told an Agency social worker that he had dual citizenship and could leave the country with the children.

---

2    Mas.D. was returned to the parents' custody during the dependency proceedings involving Mar.D. and My.D. He is not a party to this appeal and discussed only when relevant.

3

Consequently, the Agency filed dependency petitions alleging the children fell within the jurisdiction of the juvenile court pursuant to section 300, subdivision (b). Specifically, the petitions alleged the children suffered, or were at substantial risk of suffering, serious harm due to the parents' inability to provide for the children. The petitions discussed Mother's drug use and untreated mental health diagnosis, and Father's failure to protect the children from Mother's drug use and his threat to flee the country with the children.

The court issued protective custody warrants pursuant to section 340 and detained the children in out-of-home care. At the jurisdiction and disposition hearing, the court made true findings on the petitions and declared Mar.D. and My.D. dependents of the juvenile court. Reunification services were offered to the parents and Father was allowed unsupervised visitation with the children. Mother's visitation was required to be supervised.

## II.

### *Reunification Period*

During the initial review period, the parents obtained stable housing and maintained regular contact with the Agency. They participated in parenting classes and Mother started receiving medication and therapy. Father worked full-time to provide for the family and expressed a desire to reunify with the children. Mar.D. was placed in a foster home with My.D., and Father regularly communicated with the children's caregivers to request photos and video chats in order to maintain a bond with both children.

In a status review report prepared for the six-month review hearing, the Agency opined that if the parents continued to engage with services, the children would be returned to their care by the 12-month review date. The

Agency felt the parents were making slow but steady progress toward creating a stable home environment for the children. At the six-month review hearing in April 2021, the court found that the parents had substantially progressed in mitigating the causes leading to the children's dependency. Mas.D. was reunified with the parents, and a transition plan was implemented to allow the parents overnight visits with Mar.D. and My.D.

Following the six-month review hearing, the Agency received two referrals from a child abuse hotline. The first referral alleged that Father hit Mother during an altercation, causing her lip to bleed, and he then pushed Mas.D. down. The allegation was found to be inconclusive. The second referral alleged that Mas.D. left the family home without the parents' knowledge and was later returned home by a neighbor. Mother admitted that Mas.D. briefly left the home unaccompanied. The parents also admitted they left the children in the care of a friend during an overnight visit, which violated the Agency's rules prohibiting third-parties from caring for the children without Agency clearance.

In September 2021, the Agency was contacted when My.D.'s daycare facility became concerned that he was absent. An Agency social worker responded to the parents' home during the children's overnight visitation and observed injuries to My.D.'s face. My.D. had significant bruising on the left side of his temple, eye, jawline, and forehead, and he had a split and swollen lip. Father claimed the bruising was caused when Mar.D. hit My.D. in the face with a toy the day prior.

The Agency social worker spoke privately with Mar.D. in the parents' bedroom. Mar.D. denied hitting My.D. with a toy and claimed that Mother "smacked [My.D.] hard." Mar.D. maintained that Mother hits My.D. "a lot,"

5

and that she also hits him. The parents interrupted the interview and Mother repeated Father's claim that Mar.D. hit My.D. in the face. Mar.D. responded by calling Mother a "liar" and stating, "No, you did it."

The social worker transported the children to the hospital. During their drive, Mar.D. stated that Mother hit My.D. on five different occasions throughout the day prior. He also told the social worker that Father was "beating [Mother] up" and that Father would push Mar.D. if he tried to intervene. At the hospital, Mar.D. repeated his claim that Mother caused My.D.'s injuries and denied hitting his brother with a toy.

My.D. was evaluated at the hospital and additional bruising was observed behind his ear. He had redness on the entirety of his buttocks that his treatment team concluded was a bruise caused by the palm of a hand. A child abuse expert evaluated My.D.'s injuries and concluded that his bruising was not caused by a toy. She raised concerns that the injuries were intentionally inflicted.

Following this incident, the Agency asked the juvenile court to change the parents' visitation with the children from unsupervised to supervised. Counsel for Mar.D. and My.D. filed petitions asking the court to terminate reunification services and set the matter for a section 366.26 hearing. The court granted the Agency's request to modify the parents' visitation and set a hearing to address minor's counsel's petitions to terminate reunification services.

Thereafter, the Agency reported that the parents failed to complete their case plan requirements, including parenting classes, and did not maintain consistent contact with the Agency. Father was scheduled for supervised visitation with the children at a family visitation center, but the referral was closed due to lack of contact. Mother did not progress in her

6

services, telling the Agency she did not believe that she needed therapy. She reported feeling overwhelmed when Father frequently left her alone to care for the children, including the parents' fourth child who was born in May 2021.

Following the infliction of My.D.'s injuries, Mar.D. emotionally deteriorated. He experienced increased nightmares and bedwetting, and his caregivers observed him struggle with self-esteem, confidence, and emotional expression. He participated in weekly therapy to address his trauma, and his therapist reported that he would need continued support in his foster home to learn to process his experiences in a healthy way. Mar.D.'s caregivers received training and education to support his emotional needs, and they noticed a positive shift when they implemented the skills they learned. As to My.D., the Agency reported that he thrived in the home of his caregivers once he healed from his injuries.

On December 16, 2021, the juvenile court combined the 18-month review hearing with the hearing to address minor's counsel's request to terminate reunification services. At the hearing, the Agency recommended that the juvenile court terminate the parents' reunification services and set the matter for a section 366.26 hearing. The juvenile court found that although the parents had been provided with reasonable services, the extent of their progress has been none. Consequently, the court terminated reunification services and set the matter for a section 366.26 hearing, finding there was no probability of the children's return to the parents' custody if reunification services were continued.

## III.

### *Post-Reunification Period*

After reunification services were terminated, the parents continued to have supervised visitation with the children. The Agency documented their observations of the visits and described the children as excited to see the parents. The Agency noted that the children ran toward the parents and gave them hugs during their visits.

However, My.D. also ran toward his caregivers at the end of his visits and he did not appear to struggle to say goodbye to the parents. An Agency social worker observed that My.D. had difficulty separating from his caregivers and noted that he did not express a desire to be held or consoled by the parents when he cried. On one occasion, when Father attempted to grab My.D., he cried and held on tightly to his caregiver's shirt.

During Mar.D.'s visits, he told the parents that he loved and missed them and he cried when he talked about not seeing them. He expressed that he wanted to live with the parents and had a difficult time saying goodbye. He became more willing to say goodbye when he learned that he would see the parents again the following week. On one occasion, after a visit with the parents was cancelled, Mar.D. became upset and stated he did not want to leave the visitation center without seeing them.

The children's caregivers expressed an interest in adopting both children. In June 2022, Mar.D. expressed he did not want to be adopted and that he wanted to be returned to the parents. However, it was unclear if Mar.D. understood the meaning of adoption because of his young age. The Agency requested a continuance to allow his therapist to assist Mar.D. in processing the concept of adoption. In July 2022, Mar.D. was more understanding of the meaning of adoption after discussing the concept with

his therapist, and he indicated he wanted to be adopted by his caregivers. In November 2022, Mar.D. again expressed that he wanted to be adopted by his caregivers, stating it would make him "very happy" to be adopted. However, he also stated he would like the opportunity to spend time with his parents from time to time because he enjoyed their visits.

The Agency opined that Mar.D. shared a significant parent-child relationship with the parents. But the Agency also noted that in the home of his caregivers, whom Mar.D. identified as his "new mothers," he improved academically, socially, and emotionally. On more than one occasion, he expressed a desire to be adopted by them. Accordingly, the Agency believed that the continuation of the parental relationship did not "supersede the benefits of adoption." As to My.D., the Agency opined that he did not share a significant parent-child relationship with the parents. Consequently, the Agency recommended that the juvenile court terminate parental rights to both children and order permanent plans of adoption.

## III.

### *Section 366.26 Hearing*

At the section 366.26 hearing, the juvenile court heard testimony from one witness, social worker Paloma Del Prado.[3] The court admitted into evidence, without objection, Del Prado's curriculum vitae, the April 13, 2022, section 366.26 report and related addendum, and addendum reports dated

---

3    Prior to the start of the section 366.26 hearing, the court addressed Father's section 388 petition in which he asked the court to reinstate reunification services and place "the minor" in Father's care. The court found that Father did not make a sufficient showing of changed circumstances and summarily denied the petition.

9

July 12, 2022, September 8, 2022, November 8, 2022, and November 29, 2022.

Del Prado testified that Mar.D.[4] enjoyed visiting with the parents. She noted that they laughed and played together, and that he sought out the parents for affection, calling them "Mom and Dad." She observed that Father came prepared for his visits with the children and she believed that he wanted to remain part of his children's lives.

Del Prado recognized the concern of Mar.D.'s therapist that he may experience grief, loss, and confusion in the future if parental rights were terminated. And she acknowledged that Mar.D. and the parents appeared to share a significant parent-child relationship. However, she opined that the parent-child relationship did not "supersede the benefits of adoption" because Mar.D. needed the stability and structure offered by adoption. She noted that although Mar.D. initially stated he would be sad if he were adopted, he later expressed a desire to be adopted by his caregivers.

Following Del Prado's testimony, Mother argued that the evidence did not support the termination of her parental rights. She emphasized the existence of a significant parent-child bond, "particularly with [Mar.D.]." She asked the juvenile court to implement a plan of guardianship, rather than adoption.

Father asked the court to apply the beneficial relationship exception to adoption. He acknowledged that the evidence demonstrated a stronger bond between Father and Mar.D., than between Father and My.D., based on Mar.D.'s age and the portion of his life spent in the parents' care. He discussed his efforts at financially providing for the family and argued that

---

4    Del Prado did not testify regarding the significance of the parental relationship between the parents and My.D.

10

he maintained consistent visitation with the children throughout the dependency case.

The juvenile court first found that both children were generally and specifically adoptable. As to My.D., the court then found there was "no significant relationship or bond," considering he never resided with the parents and was in the foster system since birth. As to Mar.D., the court found it was "clear" he shared a significant bond with the parents, noting that he lived in the care of the parents for the first four years of his life. The juvenile court commented on the affection expressed between Mar.D. and the parents, stating, "there is a great deal of love and concern expressed both ways."

However, the court ultimately concluded there was "not sufficient evidence to lead [the juvenile court] to believe that the termination of parental rights would be a detriment to [Mar.D. or My.D.]." Thus, the court found that adoption was in the children's best interests. The court terminated the parental rights of the parents and declared Mar.D. and My.D. free from their custody and control.

Mother and Father filed a timely notice of appeal.

DISCUSSION

I.

*Beneficial Parent-Child Relationship Exception*

The parents contend the juvenile court erred by finding that the beneficial parent-child relationship exception did not apply to preclude the termination of their parental rights. They argue that the juvenile court misapplied the applicable legal factors and relied on erroneous evidence in rendering its decision. Therefore, they assert that its findings were not supported by substantial evidence and its ultimate decision constituted an

11

abuse of discretion.  For the following reasons, we disagree and conclude the parents have not met their burden of affirmatively demonstrating error.

At a section 366.26 hearing, " 'the court may order one of three alternatives:  adoption, guardianship or long-term foster care.  [Citation.]  If the dependent child is adoptable, there is a strong preference for adoption over the alternative permanency plans.' [Citation.]" (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1224.)  Once the juvenile court has determined that the dependent child is likely to be adopted, "the court shall terminate parental rights and order the child placed for adoption" unless a statutory exception to the preference for adoption applies.  (§ 366.26, subd. (c)(1).)

One such statutory exception is the beneficial parent-child relationship exception.  (§ 366.26, subd. (c)(1)(B)(i).)  It applies if "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (*Ibid*.)  The beneficial parent-child relationship exception is applicable if the parent proves the following three elements by a preponderance of the evidence:  "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*), italics in original.)

We review the juvenile court's findings as to the first two elements (regular contact and visitation and the existence of a beneficial parent-child relationship) for substantial evidence.  (*In re B.D.*, *supra*, 66 Cal.App.5th at p. 1225.)  The second element—whether the parent and child have a beneficial relationship—significantly overlaps with the first element "because '[t]he [benefit] exception applies only where the court finds regular visits and

12

contact have continued or developed a significant, positive, emotional attachment from child to parent.' [Citation.]" (*In re G.H.* (2022) 84 Cal.App.5th 15, 26–27.) Factors the juvenile court may consider in evaluating the beneficial nature of the parent-child relationship are: " '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and [the] child, and the child's particular needs.' [Citation.]" (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

Here, in evaluating the second element of the beneficial parent-child relationship exception, the juvenile court discussed the qualitative nature of the parents' visits with the children.[5] The court noted that the parents behaved appropriately during their supervised visitation with the children and that the children enjoyed seeing the parents. The court found that Mar.D. shared a "significant bond with his parents," emphasizing that he lived with the parents for the first four years of his life and that he recognized the meaning of their relationship. The court reached the opposite conclusion for My.D., finding that he did not share a "significant relationship" with the parents.

---

[5]    The juvenile court did not make an express finding on whether the first element, regular visitation and contact, was proven by a preponderance of the evidence. Because we conclude that the juvenile court did not err in finding that the second element was not proven in the case of My.D., and that the third element was not proven in the case of Mar.D., we need not determine whether substantial evidence supports the first element. However, in our discussion, we assume arguendo that the parents proved the first element by a preponderance of the evidence. We include a discussion of the nature of the visitation to determine whether the juvenile court abused its discretion in finding that the benefits of adoption outweighed the detriment of terminating the parental relationship.

13

We interpret the juvenile court's comment that Mar.D. shared a "significant bond" with the parents as a finding that they shared a beneficial relationship for purposes of the beneficial parent-child relationship exception. We conclude substantial evidence supports the court's finding. Mar.D. was six years old at the time of the section 366.26 hearing, and he spent the first four years of his life in the parents' care. He continued to refer to the parents as "Mom and Dad" throughout the dependency case and told them he loved them. Although Mar.D. ultimately expressed a desire to be adopted by his caregivers, the evidence also demonstrated that he enjoyed visiting with the parents and wanted to continue to see them. As the juvenile court noted, the evidence was clear that Mar.D. and the parents shared "a great deal of love."

We similarly interpret the juvenile court's comments that My.D. and the parents did *not* share a "significant relationship," as a finding that the evidence did not prove a beneficial relationship for the purposes of the beneficial parent-child relationship exception. As Father acknowledges in his opening brief on appeal, the substantial evidence standard is weightier where, as here, the issue on appeal turns on a failure of proof by the party who bore the burden of proof. In such a case, under the substantial evidence standard, the question " 'for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law' or, put another way, 'whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)

Having reviewed the entirety of the record, and drawing all reasonable inferences in favor of the juvenile court's finding, we conclude the evidence

does not compel a finding that the parents and My.D. shared a beneficial relationship. My.D. spent the entirety of his life outside the parents' custody, and he did not look to the parents for consolation during their visits. The evidence demonstrated that he had difficulty transitioning away from his caregivers; he was observed to cry and throw himself backward when separating from them. The Agency opined that neither parent shared a significant relationship with My.D. and the parents themselves acknowledged at the section 366.26 hearing that their relationship with Mar.D. was stronger than My.D. Accordingly, because substantial evidence supported the juvenile court's finding that the second element was not proven as to My.D., we conclude the juvenile court did not abuse its discretion in determining that the beneficial parent-child relationship exception was not applicable to preclude the termination of parental rights in his case.

However, as to Mar.D., our inquiry does not stop here. Where the juvenile court has found the existence of a beneficial parent-child relationship, as the juvenile court did here, it must then determine whether terminating the parental relationship would be detrimental to the child. (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) In evaluating detriment, the juvenile court must "decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Id.* at p. 632.) The juvenile court must then weigh the loss of this relationship with "the benefit of placement in a new, adoptive home." (*Ibid.*) As our Supreme Court cautioned, in performing its weighing analysis, the juvenile court may "not compar[e] the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)." (*Id.* at p. 634.)

We review the juvenile court's "ruling on the third element under a hybrid standard, reviewing its factual determinations concerning the detriment analysis for substantial evidence but its ultimate weighing of the relative harms and benefits of terminating parental rights for an abuse of discretion." (*In re Eli B.* (2022) 73 Cal.App.5th 1061, 1068.) Under the substantial evidence standard, " 'we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' " (*In re R.T.* (2017) 3 Cal.5th 622, 633.) Under the abuse of discretion standard of review, we determine whether the juvenile court's decision exceeded the bounds of reason, and, in so doing, we cannot substitute our view for that of the juvenile court. (*Caden C.*, *supra*, 11 Cal.5th at p. 641; *In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.)

The parents argue, and the Agency concedes, that when the juvenile court evaluated the harm of severing Mar.D.'s relationship with the parents, it erroneously attributed aspects of My.D.'s behavior to Mar.D. During its analysis, the juvenile court stated,

> "[A]t least as far as [Mar.D.] is concerned, he does have difficulties transitioning away from the caregiver to the parents. Once he gets to the parents, he becomes comfortable. But initially, those transitions—at least that transition has been a bit problematic, as the Agency reports that on multiple occasions, [Mar.D.] would hold onto the caregiver and have difficulty in making that transition. ¶ And then it was reported that once the visit was over, [Mar.D.] would run back to the caregiver and transition in direction rather easily."

We agree with the parents that the behavior described by the juvenile court was attributable to My.D., as detailed in the Agency's addendum report dated September 8, 2022. However, "[e]ven if the trial court articulates the

16

wrong reasons when arriving at a correct conclusion, we will presume the judgment correct and affirm it on any ground supported by the evidence, whether articulated by the trial court or not. [Citation.]" (*In re Marriage of Brooks* (2019) 33 Cal.App.5th 576, 593.) Thus, "if the trial court's order was correct on any legal theory, we will affirm it, even if the trial court's reasoning was wrong." (*In re Marriage of Wang & Zhou* (2021) 62 Cal.App.5th 1098, 1008.) Disregarding the juvenile court's statements in which it apparently confused Mar.D. and My.D.'s behavior, we nevertheless find no error in the juvenile court's ruling because substantial evidence supports a finding that Mar.D. would not suffer detriment at the termination of parental rights. (See *In re Dakota H.* (2005) 132 Cal.App.4th 212, 230 [we uphold the judgment if it is supported by substantial evidence, "[e]ven though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence."].)

Contrary to the parents' arguments, the evidence was not "uncontroverted" that the strength of Mar.D.'s bond with the parents compelled a finding of detriment at the severance of their relationship. Although the evidence demonstrated that the parents' *supervised* visitation was generally positive, Mar.D. disclosed abusive behavior by the parents during their *unsupervised* visitation. Mar.D. alleged that Mother repeatedly hit My.D., causing extensive bruising, and that she falsely blamed Mar.D. for My.D.'s injuries. Mar.D. "emotionally deteriorated" following this incident and he needed weekly therapy to address his trauma. He also alleged that Father was "beating up" Mother in his presence.

Despite evidence of the negative effects of the parents' behavior on Mar.D., the juvenile court still acknowledged the existence of a bond between them, commenting that they shared a great deal of love and that the parents

behaved appropriately during their supervised visitation.  However, a "showing the child . . . derive[s] *some* benefit from continuing a relationship maintained during periods of visitation" is not a sufficient ground to depart from the statutory preference for adoption.  (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.)  Affectionate visits with a parent are not enough.  (*Id.* at p. 468).

The focus of the third element of the beneficial parent-child relationship exception is on "how the child would be affected by losing the parental relationship—*in effect, what life would be like for the child in an adoptive home without the parent in the child's life.*"  (*Caden C.*, *supra*, 11 Cal.5th at p. 633, italics added.)  This analysis requires the juvenile court to look to the child's experience with the caregivers to determine "how a prospective adoptive placement may offset and even counterbalance" the harm in terminating parental rights.  (*Id.* at p. 640.)  The focus of this analysis is not to compare the parental attributes of the caregivers with that of the parents, but to examine what the child's life looks like in his prospective adoptive home, without a parental relationship with the parents.  (*Id.* at p. 634 [the juvenile court may not compare "the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)."].)

Here, in the parents' absence, the Agency reported that Mar.D. "continued to thrive" in his prospective adoptive placement and "significantly improved in his academics, and social and emotional skills."  The caregivers ensured that Mar.D. continued to receive weekly therapy to address his emotional issues, and they sought out tools to assist him in this process.  And after learning more about the concept of adoption with his therapist, Mar.D. reported that it would make him "very happy" to be adopted by his caregivers.  The Agency social worker opined that the benefits of adoption

18

outweighed any potential detriment resulting from the termination of parental rights because Mar.D. needed the stability and structure offered by adoption. The social worker's opinion was supported by ample evidence in the record, discussed above, demonstrating that Mar.D. progressed in the absence of his parents and in the home of his caregivers.

Accordingly, we conclude substantial evidence supports the juvenile court's finding that there was insufficient evidence of detriment, and we perceive no abuse of discretion in the court's determination that the beneficial parent-child relationship did not apply. (See *Caden C.*, *supra*, 11 Cal.5th at p. 641 [" ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' "].) Thus, the parents have not met their burden of affirmatively demonstrating error.

## II.

### *ICWA Inquiry*

Mother argues substantial evidence did not support the juvenile court's finding that ICWA did not apply because the Agency failed to conduct an inquiry of available extended family members. She further argues the Agency did not fulfill its inquiry duties under ICWA by failing to review the parents' child welfare files. Father joins her argument. The Agency concedes it did not fully comply with its duties under ICWA by failing to conduct an inquiry of two paternal uncles with whom the Agency had contact. It further concedes that to the extent the parents' child welfare files contained information that could assist the Agency in conducting its ICWA inquiry, the Agency should have investigated the files. We accept the Agency's concession

19

and conclude a limited remand is necessary to ensure compliance with ICWA.[6]

### A. *Additional Background*

At the outset of the case, the parents informed the Agency they did not have Native American heritage. The Agency reported the parents' statements denying Native American ancestry in the detention report, and the juvenile court found that ICWA did not apply. However, the court ordered the Agency to conduct a further ICWA investigation and report its findings to the court.

The record demonstrates that both parents had child welfare history as minors, and they were a part of the extended foster care system. However, there is no evidence in the record that the Agency investigated the child welfare files to determine if there was information relating to ICWA or contact information for biological relatives who may have had further information. Nor does the record indicate that the Agency made ICWA inquiries from two paternal uncles with whom they had contact. Although Father later affirmed his denial of Native American heritage, there is no documentation of further investigative efforts by the Agency relating to ICWA in the record.

---

[6]     The Agency further argues the juvenile court failed to ask the parents, who were present at the hearings, whether they knew or had reason to know the children were Indian children, and to inform the court if they subsequently received information providing a reason to know the children were Indian children. (§ 224.2, subd. (c).) Because we conclude a limited remand is necessary to permit the Agency to conduct an adequate ICWA investigation, we assume the juvenile court will fully comply with its duties under ICWA and need not address the issue.

At various hearings throughout the dependency case, including the section 366.26 hearing at which parental rights were terminated, the juvenile court found that ICWA did not apply.

*B. Analysis*

Congress enacted ICWA in order to address the separation of "Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes. [Citation]." (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7.) Thereafter, our Legislature enacted statutory provisions to effectuate ICWA's purposes. (*Id.* at p. 9.) Under California law, the juvenile court and Agency have an "affirmative and continuing duty" to inquire whether a child subject to juvenile dependency may be an Indian child. (§ 224.2, subd. (a).)

"This continuing duty [of inquiry] can be divided into three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice." (*In re D. F.* (2020) 55 Cal.App.5th 558, 566.) In the first phase, the Agency's initial duty requires it to, at a minimum, inquire from the party reporting child abuse or neglect whether they have information that suggests "the child may be an Indian child."[7] (§ 224.2, subd.

---

[7] Mother argues the Agency was required to interview "extended family members" as part of its initial inquiry pursuant section 224.2, subdivision (b). However, as recently clarified in *In re Robert F.* (Apr. 12, 2023, E080073), the Agency's duty to interview extended family members as part of its initial inquiry is only triggered when a child is taken into "temporary custody of a county welfare department pursuant to section 306." (§ 224.2, subd. (b).) Here, the children were taken into protective custody pursuant to a warrant under section 340, and therefore section 224.2, subdivision (b), is not strictly applicable, at least with respect to the Agency's duty to inquire from extended family member as part of its initial duties. However, as we further discuss, under the circumstances of this case the Agency was required to interview available extended family members as part of its continuing duty of inquiry.

(a).) In the second phase, "if that initial inquiry creates a 'reason to *believe*' the child is an Indian child, then the Agency 'shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.'" (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052.) In the third stage, "if that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply." (*Id.* at p. 1052.)

A juvenile court finding that ICWA is inapplicable generally implies that the Agency has fulfilled its inquiry duty. (See *In re Austin J.* (2020) 47 Cal.App.5th 870, 885.) We review ICWA findings for substantial evidence, but "where the facts are undisputed, we independently determine whether ICWA's requirements have been satisfied." (*In re D.S.*, *supra*, 46 Cal.App.5th at p. 1051.)

Here, the parents initially denied Native American heritage prior to the detention hearing, and Father later reaffirmed his denial. Consequently, at the inception of the dependency case, the Agency did not have affirmative evidence giving them a reason to believe the "child[ren] may be Indian child[ren]." (§ 224.2, subd. (a).) However, the Agency's duty to inquire is continuing, and the sufficiency of their investigative efforts is "necessarily fact specific." (*In re K.H.* (2022) 84 Cal.App.5th 566, 604.) "The agency's inquiry must extend far enough to reasonably ensure that if there is information the child is or may be an Indian child, that information is gathered." (*Ibid.*) Because their inquiry is "often the only opportunity to collect such information, it is a critical step in safeguarding the rights ICWA was designed to protect." (*Ibid.*)

On the record before us, we cannot conclude the Agency's inquiry extended far enough. As minors, the parents were both part of the child

welfare system and their history raises concern that the "parents may not know their possible relationship with or connection to an Indian tribe." (*In re Y.W.* (2021) 70 Cal.App.5th 542, 554 [holding that the Agency's failure to interview the biological parents of the mother, who had been adopted, was reversible error.].) The Agency failed to examine the parents' child welfare files for contact information of biological relatives who may have had further information relating to ICWA. Under the circumstances presented in this case, these efforts were reasonably necessary for the Agency to fulfill its duties of inquiry under ICWA. (*In re K.H.* (2022) 84 Cal.App.5th 566, 604 ["Resolution of the issue in a given case is necessarily fact specific, but reasonableness, viewed through the lens of ICWA's purpose, is the touchstone."].)

The parents' denial of any Native American heritage does not relieve the Agency of its "broad duty" to inquire of readily ascertainable extended family members whether the children are Indian children. (*In re Y.W.*, *supra*, 70 Cal.App.5th at p. 554.) A contrary rule would "ignore[ ] the reality that parents may not know their possible relationship with or connection to an Indian tribe." (*Ibid.*; see *In re S.R.* (2021) 64 Cal.App.5th 303, 314 ["the children's parents apparently had no idea of their family's connection to the . . . tribe . . . , even though the children's great-grandmother was a member"]; see also *In re T.G.* (2020) 58 Cal.App.5th 275, 295 [noting that ICWA's "expansive" duty of inquiry "is premised on the commonsense understanding that, over time, Indian families, particularly those living in major urban centers . . . , may well have lost the ability to convey accurate information regarding their tribal status"].) Despite the parents' denials of Native American heritage, biological relatives—in this case, the paternal uncles—were readily available to the Agency and their responses would

likely have borne "meaningful information," regardless of the outcome of the inquiry. (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 744.)

Thus, we conclude that substantial evidence does not support the juvenile court's findings that ICWA did not apply. We conditionally reverse the juvenile court's order terminating parental rights for a limited remand to ensure compliance with ICWA's inquiry obligations. Given the importance of expediency and need for finality, we encourage the parties to stipulate to immediate issuance of the remittitur in this case. (Cal. Rules of Court, rule 8.272(c)(1).)

## DISPOSITION

The orders terminating parental rights are conditionally reversed and the matter is remanded to the juvenile court with directions that, within 30 days of the remittitur, the Agency must file a report demonstrating its compliance with the inquiry provisions of section 224.2. Within 45 days of the remittitur, the juvenile court must conduct a hearing to determine whether the Agency's investigation satisfied its affirmative duty to investigate. The juvenile court has the discretion to adjust these time periods on a showing of good cause.

If neither the Agency nor the juvenile court has reason to believe or to know that Mar.D. and My.D. are Indian children, the orders terminating parental rights shall be reinstated by the juvenile court. Alternatively, if after completing the inquiry the Agency or the juvenile court has reason to believe that Mar.D. and My.D. are Indian children, the court shall proceed accordingly.

HUFFMAN, Acting P. J.

WE CONCUR:


KELETY, J.


CASTILLO, J.