Filed 10/17/23  M.R. v. M.P. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| M.R.,<br><br>        Petitioner and Appellant,<br><br>    v.<br><br>M.P.,<br><br>        Respondent. | D080247<br><br><br><br>(Super. Ct. No. ED87165) |

APPEAL from a judgment of the Superior Court of San Diego County, David M. Rubin, Judge.  Affirmed as modified.

M.R., in pro. per., for Petitioner and Appellant.

Cage & Miles and John T. Sylvester for Respondent.

M.R. (Father) appeals from a family court order denying his request to move A.P.R., the child he shares with M.P. (Mother), to Sacramento.  Father had been splitting time between Sacramento, where he is from and works, and San Diego, where A.P.R. lives and attends school.  After weighing various factors, included those required under *In re Marriage of LaMusga* (2004) 32 Cal.4th 1072, 1101 (*LaMusga*), the trial court denied Father's request because it found that moving A.P.R. away from San Diego, the place

of his "daily social network," would be "disruptive" and not in his best interest.

The trial court modified custody and visitation to: (1) adjust for Father's move; (2) give Mother sole legal custody over medical decisions about A.P.R.'s short stature, a source of major conflict between the parents; and (3) order A.P.R. and his parents to enroll in individual therapy to address Father and Mother's high-conflict parenting. The trial court denied Father's motion for a new trial.

Father argues that the trial court erred when issuing these orders. Mother contends that Father waived all rights to appellate review by failing to present evidence that supports the trial court's findings and order. While true as to some points, we choose to address the merits of the appeal unless waived on other grounds. We affirm the judgment with one modification for the reasons explained below.

On the move-away request, the trial court properly assumed Father would move to Sacramento and crafted a custody plan accordingly. Father's challenge to the overall move-away analysis amounts to a disagreement over the weight given to the evidence and *LaMusga* factors, which is the province of the trial court and not subject to reassessment on appeal.

As for legal custody, we conclude that substantial evidence supports the findings and the order advances A.P.R.'s best interest. Father faults the trial court for relying on allegedly false and contradicted medical expert evidence, but contradicted evidence may support a judgment and we do not reassess witness credibility on appeal. For similar reasons, we conclude that the trial court properly denied Father's motion for new trial based on related additional evidence.

2

Although the trial court made the findings required to order A.P.R. and his parents to attend individual counseling, the open-ended order exceeded the statutory time limit of one year.  (§ 3190, subd. (a).)

Lastly, we disagree with Father's due process claims based on privacy violation and gender bias.  Father waived his argument that the trial court violated his privacy and penalized him for asking Mother to get an abortion, and failed to show how the trial court's brief reference to this issue affected the judgment.  As for gender bias, the non-waived examples Father cited are not extreme facts that would rise to a due process violation.

We therefore modify the judgment to limit the duration of the court-ordered therapy to one year and affirm the judgment as modified.

## I.

## A.

Mother and Father dated briefly in Sacramento.  After Mother moved back to San Diego, she learned she was pregnant.  According to Mother, Father told her "several times" that he wanted her to terminate the pregnancy.  But Father later expressed his desire and took steps to be "part of [A.P.R.]'s life."  Since A.P.R.'s birth, Father's physical custody has increased to 50%, much spent in San Diego.

In September 2021, when A.P.R. was nine years old, Father filed a request to move the child to Sacramento.  Father practices law in Sacramento, and he has turned down work opportunities because of his frequent travel to San Diego.  According to Father, A.P.R. would benefit from living in Sacramento because it "has far more extracurricular activity opportunities."  Mother opposed the move.  The parties presented evidence at trial in late 2021.

B.

Testimony at the move-away trial established that A.P.R. lives and attends school in San Diego. He generally spends one week at a time with each parent. His friends or relatives live near his Mother's home. At school, A.P.R. has a "very good group of friends" and is "thriving." He also enjoys a "close" relationship with his paternal family in Sacramento.

Father and Mother, however, rarely see eye-to-eye on parenting decisions.

C.

A.P.R.'s medical care is a source of "major conflict," particularly related to his height and vaccinations.

1.

When A.P.R. was six months old, pediatric genetics specialist Mark Nunes initially gave him a dual diagnosis of either hypochondroplasia or familial short stature. Hypochondroplasia—one of 180 known forms of skeletal dysplasia, or dwarfism—is a "mild" version with "no therapy or treatment or medical intervention" during childhood. Familial short stature is a "variation of normal" that would mean A.P.R. will be on the shorter side because his mother, grandmother, and great-grandmother are 5', 4'8", and 4'11", respectively.

The testing that A.P.R. underwent did not yield any positive indication of skeletal dysplasia. A.P.R., according to pediatric geneticist Billur Moghaddam and her review of A.P.R.'s records, has "not displayed a recognizable syndrome or skeletal dysplasia." His genetic test for hypochondroplasia came back "negative." Moghaddam typically recommends that children presented with short stature undergo a "standard workup" to test for certain enzyme deficiencies, thyroid hormones, kidney disease, and

Celiac disease.  A.P.R. completed the enzyme and thyroid tests, both of which "came back normal."  Although A.P.R. did not take the other two tests, to Moghaddam's knowledge, he does not present with other symptoms associated with kidney function issues or Celiac disease.  Moghaddam assessed A.P.R.'s bone age and found it "about two years behind his chronological age."  Delayed bone age can signal that A.P.R. is a "late bloomer" or might have a "subtle kidney disease or a number of skeletal dysplasias."  To Nunes, the bone age graph results "confirmed that there was no therapy or treatment that [A.P.R.] would benefit from."

Father and Mother disagree about whether to continue testing A.P.R. for height-related issues.  Father, on the one hand, wants to continue testing for other types of skeletal dysplasia.  He relies on Moghaddam's testimony that the "purpose" of obtaining a diagnosis is to learn about "any potential additional health issue" related to the condition and "hopefully avoid it."  Mother, on the other hand, sees no "medical necessity" to "continuing to run test after test" based on information from Nunes and pediatrician Theodore Ng.  Based on A.P.R.'s growth velocity and short maternal line, Nunes now believes that he is "normal."  Because A.P.R. presents no indication of "any distress or any problems," Ng thinks that testing falls within parental discretion.  Neither he nor Nunes believe that further testing is necessary because it would not change A.P.R.'s current medical treatment.  Father considers Mother's approach "real casual towards potential medical issues."

2.

Vaccines present another conflict point.  When A.P.R. was younger, Mother initially hesitated to get him a flu shot due to a mercury-based preservative in the vaccine.  As she investigated, Mother sent Father a link to an article from an "anti-vaccine" website, which prompted Father to accuse

her of "anti-vaccine beliefs." Mother disputes this label and professes no issue with vaccines. Ng confirmed that A.P.R. is "fully vaccinated," and he does not consider Mother an "anti-vaxxer."

### D.

In addition, the parties' disagreements have disrupted A.P.R.'s continuity of medical care and created uncertainty about his education. Father pays for A.P.R.'s health insurance and private school tuition. A.P.R. had Kaiser health insurance from birth until 2019, when Father decided to cancel it, which required A.P.R. to change healthcare providers. For school, Mother feels "stuck between a rock and a hard place" because Father "threatens" to stop paying tuition "if he's dissatisfied with something."

### E.

After hearing the evidence and arguments, the trial court weighed the *LaMusga* and other factors, concluded it was not in A.P.R.'s best interest to move to Sacramento, and thus denied Father's request. The trial court determined that most of A.P.R.'s "daily social network" is in San Diego and it would be "disruptive" to move him away from the place where he had lived most of his life. The trial court briefly noted Father's early request that Mother terminate the pregnancy in the context of Mother's "initial reluctance to share parenting time," but found that issue "mostly resolved" by trial because "both parents will foster frequent contact with the other."

The trial court also issued a custody and visitation plan. Relevant here, it gave the parties joint physical custody. It largely maintained the parties' current physical custody arrangement of one week on, one week off until Father moves. Once Father moves, A.P.R. will spend the bulk of his school holidays with Father in Sacramento. During the school year, Father will care for A.P.R. in San Diego 11 days a month. If Father cannot exercise

6

his full 11-day visit, he may waive it with advance notice to Mother. If A.P.R.'s school transitions to remote learning, Father may spend that time with A.P.R. in Sacramento.

Under the order, the parties share joint legal custody except for medical decisions about A.P.R.'s height. Mother received sole legal custody "for purposes of health and medical care decisions concerning [A.P.R.'s] short stature." The trial court found that "genetic and other testing revealed [A.P.R.] does not have dwarfism" and Father's "continued focus on [A.P.R.'s] short stature is not helpful" to the child. Regarding the flu vaccine dispute, the trial court concluded that Mother's "reluctance . . . did not reflect general hostility to vaccines nor medical science," but rather a desire to know more as "a first-time mother." It warned, however, that "[w]ere there to be another instance in which [Mother] chose to block a recommended vaccination[,] a court would likely need to revisit that finding."

In addition, the trial court ordered A.P.R., Father, and Mother to each attend individual therapy. While too young to reliably opine about where he wants to live, A.P.R. "is old enough to be aware that his parents do not get along." That "tension" is negatively "impacting" him. Ng opined that A.P.R. would "very much" benefit from mental health counseling given the "contentious" parenting situation. The trial court directed A.P.R.'s therapy to focus on "helping [A.P.R.] adjust to his emotional state and his parents' high conflict parenting." Father and Mother's therapy would focus on "[h]igh conflict parenting; improving communication skills, and anything else the therapist deems relevant." The trial court observed that the parents' therapy "may give each an insight into better ways to talk to one another about [A.P.R.]." The order did not set an end date for A.P.R.'s therapy and committed Father and Mother to participate "until released by the therapist."

To pay for A.P.R.'s therapy, the trial court required Mother to select therapists covered by Father's insurance and obligated the parties to evenly split any "costs not covered by insurance." Elsewhere in the statement of decision, the trial court noted that Father pays "significant private school tuition" and is a "much higher income earner" than Mother.

Finally, the trial court rescinded the *Montenegro* status of the custody orders, which would require a "significant change in circumstances" to modify (*Montenegro v. Diaz* (2001) 26 Cal.4th 249, 256 (*Montenegro*)), to give the parties and court "more flexibility in this dynamic situation."

F.

Even before receiving the final statement of decision, Father moved for a new trial. Relevant to this appeal, Father sought a new trial based on (1) additional evidence related to Nunes' credibility, including a post-trial declaration from a non-party patient who accused Nunes of "making false accusations and being dishonest in the medical records"; and (2) "an after-visit summary from [A.P.R.'s] current geneticist showing that genetic testing did not disprove the presence of a skeletal dysplasia." The trial court denied the motion.

Three months after filing his appellate reply brief, Father moved to augment the record with exhibits related to legal custody and Nunes' credibility. Mother opposes the motion.

II.

Father appeals multiple aspects of the trial court's order. First, he argues that the trial court abused its discretion when it denied the move-away request because it (1) did not treat Father's plan to relocate seriously and (2) improperly weighed and analyzed the move-away factors. Second, he disputes the decision to give Mother sole legal custody over

8

medical decisions about A.P.R.'s height as (1) premised on a factually inaccurate finding; (2) based on false and misleading evidence from Nunes; and (3) not in A.P.R.'s best interest given Mother's alleged anti-vaccination beliefs. Relatedly, Father appeals the denial of his motion for new trial based on evidence about legal custody and Nunes' credibility. Third, Father objects to the court-ordered individual therapy as noncompliant with Family Code section 3190. Fourth, he accuses the trial court of violating due process by disregarding Father's "constitutional rights to privacy" and displaying prejudicial gender bias in favor of Mother.

We address Mother's waiver argument before turning to Father's grounds for appeal.

A.

Mother argues that Father waived his right to appellate review because he "fails to summarize both the favorable and unfavorable evidence" from most witnesses and "relies primarily on his own testimony to support his arguments."

An appellant challenging the sufficiency of the evidence must affirmatively demonstrate error. (*Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1408.) To do so here, Father must set forth all material facts and evidence, including facts and evidence *damaging* to his position. (*Ibid.*) When an opening brief states only evidence favorable to the appellant's position and ignores evidence supporting the judgment or finding, we may treat any substantial evidence contention as waived and presume the record contains evidence to support the trial court's factual findings. (*In re Marriage of Fink* (1979) 25 Cal.3d 877, 887.)

While we agree with Father that he need not summarize evidence irrelevant to the issues on appeal, he must identify and address the evidence

9

that supports the aspects of the judgment he challenges. For certain arguments, however, Father presents a one-sided view of the evidence, omitting any unfavorable evidence. Father's challenge to the accuracy of the trial court's findings and the resulting order giving Mother sole legal custody over health and medical care decisions about A.P.R.'s short stature is one example. Although Father cites to the sections of the statement of decision addressing this topic, he fails to cite any *record* evidence that supports the trial court's findings, such as testimony about A.P.R.'s likely familial short stature and how his further testing is unlikely to change his medical treatment. Similarly, Father cites evidence about Mother's purported "anti-vaccination beliefs" without acknowledging trial testimony to the contrary.

Although the deficiencies in Father's presentation of facts arguably justify waiver, we exercise our discretion to nonetheless address the merits of the appeal, except where, as noted below, other grounds justify waiver. (*In re Marriage of Brooks* (2019) 33 Cal.App.5th 576, 588.) As a result, we need not address Father's reply arguments about waiver.

B.

Father challenges the move-away order on two main grounds. First, he argues that the trial court abused its discretion by not treating Father's plan to relocate "seriously" and, consequently, not actually awarding joint physical custody. Second, he challenges the overall move-away analysis as "flawed."

We review custody and visitation orders under the deferential abuse of discretion test. (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32 (*Burgess*).) When, as here, parents share joint physical custody and one parent intends to move, the trial court decides what post-move custody arrangement serves the child's best interest. (*Id.* at p. 40, fn. 12.) On appeal,

10

we ask if the trial court could have "reasonably concluded" that the order "advanced the 'best interest' of the child." (*Id.* at p. 32.) We must uphold the ruling if it is correct on "any basis," even one not mentioned by the trial court. (*Ibid.*)

On a move-away request, the trial court considers the following non-exhaustive list of factors: (1) the child's interest in stability and continuity in the custodial arrangement; (2) the distance of the move; (3) the child's age; (4) the child's relationship with both parents; (5) the relationship between the parents, including their ability to communicate and cooperate effectively and their willingness to put the child's interests above their own; (6) the child's wishes, if mature enough; (7) the reasons for the proposed move; and (8) the extent to which the parents currently share custody. (*LaMusga*, *supra*, 32 Cal.4th at p. 1101.) "The weight to be accorded to such factors must be left to the court's sound discretion." (*Id.* at p. 1093.)

1.

Father's first argument centers on the first *LaMusga* factor of the child's interest in stability. The trial court found that this factor "weighs evenly"—not for or against allowing A.P.R. to move to Sacramento with Father—because the parents equally shared physical and legal custody and "[t]hat part of the child sharing arrangement will not be disturbed." After Father moves, A.P.R. will spend certain school breaks and holidays in Sacramento. In addition, during the school year, the order permits Father to spend 11 days a month with A.P.R. in San Diego, an option he can waive with advance notice if he is unable to exercise some or all of that time. Father asserts that these optional 11 days in San Diego show that the trial court did not take his request to relocate seriously and did not in fact award joint physical custody. We disagree.

11

To start, the custody order reflects that the trial court accepted Father's plan to relocate. The trial court "must treat the plan as a serious one" and decide custody issues on the assumption that the parent is moving. (*F.T. v. L.J.* (2011) 194 Cal.App.4th 1, 22.) Here, the trial court created a custody plan to cover the time both before *and after* Father moves to Sacramento expressly because it "ha[d] to assume the move away is going to occur." That Father has the option to waive any portion of the 11-day visit he cannot exercise shows that the trial court expected Father to reside and work in Sacramento. The trial court reinforced that point when it allowed A.P.R. to spend those 11 days in Sacramento if his school transitioned to fully remote learning. Thus, contrary to Father's assertion, this case is not like *F.T. v. L.J.*, where the trial court abused its discretion because it "assume[d]" the father would not move if it denied the request. (*F.T. v. L.J.*, at p. 22.)

Next, Father argues that the trial court's order "appears to be contrary to law" because the "only way" to maintain joint physical custody is if Father uses his 11 days a month in San Diego. Even setting aside the fact that Father first raised this point in his reply brief, the point is arguably still waived because Father cites no legal authority that precludes a court from offering a relocating parent optional time with the child in the child's home location. (See *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785 (*Badie*).)

Even if we accept Father's premise that the trial court erred by finding that the post-move arrangement would not disturb the parties' equal share of time with A.P.R., Father does not show how that error affected the outcome. Regardless of how the trial court decided the move-away request, A.P.R. would have to spend the school year in a city where one parent does not reside. The optional 11 days in the trial court's order reflects an attempt to

12

serve the child's best interest in terms of spending significant time with each parent while recognizing the child's need to spend the school year in one location, the relative proximity of Sacramento to San Diego, and the reality that remote working options could allow Father to spend some of his physical custody time in San Diego. We conclude that the trial court did not abuse its discretion on this basis.

2.

Second, Father claims that the trial court's "overall move[-]away analysis was flawed." Specifically, he challenges: (1) the finding that A.P.R. is "equally bonded to both parents"; (2) how the trial court compared the parents' history of animosity; (3) that the court considered moving A.P.R. to Sacramento would be disruptive; (4) the purported insufficient emphasis on A.P.R.'s lack of extracurricular activities in San Diego; (5) the analysis of the parents' "tumultuous and unpredictable" communication and inability to put A.P.R.'s interests first; (6) the alleged failure to analyze grandparents who reside with A.P.R. in San Diego[1]; and (7) that the court "did not take Mother[']s behavior for making false, serious allegations serious[ly] enough."

In essence, Father disagrees with how the trial court weighed the evidence and factors. But as the reviewing court, we do not reweigh the evidence or assess the credibility of witnesses. (*Pope v. Babick* (2014)

---

[1]     Father does not offer any legal authority that requires the trial court to analyze grandparents residing with the child. Instead, he quotes an expert from *LaMusga* who testified about the risk that the mother's relative might " 'foment the anger' " and contribute to the deterioration of the father's relationship with the children. (*LaMusga, supra*, 32 Cal.4th at p. 1084.) Here, however, the trial court addressed any similar concern when it observed the "stress put on [A.P.R.]" by family members and friends "denigrating" the parents and thus ordered the parties to "not allow any others to make negative statements about the other parent, or that parent's family or friends, in [A.P.R.]'s presence or hearing."

229 Cal.App.4th 1238, 1246 (*Babick*).) Nor can we weigh the factors differently than the trial court did in its sound discretion. (*LaMusga*, *supra*, 32 Cal.4th at p. 1093 ["The Court of Appeal erred in substituting its judgment for that of the superior court."].) However strongly Father disagrees, the trial court was entitled to adjudicate the facts as it saw appropriate based on its review of the evidence and observations of the witnesses' testimony and demeanor, and we do not reweigh the evidence on appeal.

That the record may contain evidence supporting Father's claims is irrelevant to our role on appeal, which is limited to assessing the sufficiency of the evidence *supporting* the judgment. (*Babick*, *supra,* at p. 1245.) Here, the trial court considered the appropriate factors and found that all were neutral or not applicable except for two. In the end, the trial court found that A.P.R. should remain in San Diego because most of his "daily social network is here" and it would be "disruptive" to move A.P.R. away from the place where he had lived most of his life. The record supports these factual findings. A.P.R. lives and attends school in San Diego. Friends and relatives live nearby, and he is "thriving" at school, where he has a "very good group of friends." Since A.P.R. started school in fall 2017, Father has spent substantial time with him in San Diego. This evidence could reasonably lead the trial court to conclude that moving to Sacramento would disrupt A.P.R.'s strong San-Diego-based routines and relationships. Father's arguments to the contrary, many of which lack legal support, do not persuade us that the trial court abused its direction.

## C.

Next, Father contends that the trial court abused its discretion when it awarded Mother sole legal custody for "health and medical care decisions

14

concerning [A.P.R.'s] short stature." Father's appeal of the order denying his motion for new trial centers on evidence related to this issue, so we address those arguments at the end of this section.

Like physical custody, we review legal custody for abuse of discretion to see if the order advances the child's best interest. (*Burgess*, *supra*, 13 Cal.4th at p. 32.) On appeal, we view the evidence in the light most favorable to the judgment. (*Crawford v. Southern Pac. Co.* (1935) 3 Cal.2d 427, 429 (*Crawford*).) To that end, we draw all reasonable inferences in support of the trial court's ruling and defer to its express or implied findings when supported by substantial evidence, even if contradicted by other evidence. (*Ibid.*)

1.

Father first challenges the sufficiency of the evidence for the trial court's finding that "genetic and other testing revealed [A.P.R.] does not have dwarfism." Father interprets this statement to mean the trial court found that A.P.R. tested negative for all types of dwarfism, also known as skeletal dysplasia. He is correct that no doctor said that A.P.R. tested negative for all 180 known forms of skeletal dysplasia. But we can—and thus must— reasonably infer that the trial court meant that the testing A.P.R. underwent did not indicate that he has skeletal dysplasia. In other words, A.P.R. has not tested positive for skeletal dysplasia. Substantial evidence supports this finding. A.P.R. tested negative for hypochondroplasia, the type of skeletal dysplasia that doctors first suspected he might have. A.P.R.'s other tests "came back normal," and he does not present with other symptoms that might indicate kidney function issues or Celiac disease, two conditions he has not tested for. Thus, as the trial court found, the genetic and other testing A.P.R. underwent did not show he had skeletal dysplasia.

2.

Father also faults the court for "trusting" Nunes over Moghaddam. Relatedly, Father contends that Nunes presented "false and misleading evidence" about A.P.R.'s medical condition. These arguments boil down to questioning Nunes' credibility and the admissibility of his testimony, which we review for abuse of discretion. (*In re Sims* (2021) 67 Cal.App.5th 762, 777.) Father originally pressed for independent review, but effectively conceded in his reply brief that the abuse of discretion test applies here.

The trial court alone makes witness credibility determinations. (*In re Sims*, *supra*, 67 Cal.App.5th at p. 777.) "[W]e are precluded from reweighing credibility." (*Ibid.*) Father questioned Nunes' veracity before and during trial, which allowed the trial court to make an informed decision when considering his testimony. To the extent the trial court found Nunes credible and relied on his testimony, we will not disturb that assessment.

"[A]ny substantial evidence, *contradicted* or uncontradicted," warrants affirming the judgment. (*Crawford*, *supra*, 3 Cal.2d at p. 429, italics added.) As a result, it makes no difference that Moghaddam's testimony "directly contradicted" some of Nunes', as Father claims. The trial court found that Father's "continued focus on [A.P.R.]'s short stature is not helpful to [A.P.R.]" and gave Mother sole legal custody for related medical decisions. Substantial evidence supports that conclusion. For example, neither Nunes nor Ng believed additional testing related to A.P.R.'s short stature was necessary because it would not change his medical treatment. Because A.P.R. presents no indication of "any distress or any problems," Ng opined that the testing falls within parental discretion. Based on A.P.R.'s personal and familial medical history, Nunes testified that A.P.R. "is a normal child" with "nothing to test for." Thus, even though Moghaddam (and Father) would prefer

16

additional testing for different forms of skeletal dysplasia, other evidence supports the trial court's decision to give Mother the right to decline such testing. Granting Mother the sole right to make those decisions resolves one of the "major conflict areas" between the parents. Doing so will hopefully reduce their "domestic battling," which would advance A.P.R.'s best interest.

3.

Finally, Father questions the trial court's judgment because Mother has "advocated anti-vaccine beliefs" "in the past," which Father implies makes her unfit to oversee A.P.R.'s medical care as it relates to height. He focuses on Mother's initial hesitancy to give A.P.R. a flu shot due to concern about a mercury-based preservative in the vaccine.

The trial court considered that evidence and concluded that Mother's "reluctance with the flu vaccine did not reflect general hostility to vaccines nor medical science." That finding, too, is supported by substantial evidence. Although at that time Mother sent Father a link to an article from an "anti-vaccine" website, at trial she disclaimed being a "non-vax[x]er" or having any problem with vaccines generally. Pediatrician Ng confirmed that A.P.R. is "fully vaccinated" and testified that he would not label Mother as an "anti-vaxxer." Thus, the trial court could reasonably conclude that giving Mother sole legal custody on this issue would advance, not harm, A.P.R.'s best interest.

The trial court's custody order came with guardrails. The trial court cautioned that, "[w]ere there to be another instance in which [Mother] chose to block a recommended vaccination[,] a court would likely need to revisit that finding." It also rescinded the *Montenegro* status of the custody orders to give the parties and court "more flexibility in this dynamic situation." These

17

actions reflect the "child-centered" nature of the court's ruling, which was designed with A.P.R.'s best interests in mind.

4.

Father appeals the denial of his motion for new trial based on additional evidence related to Nunes' credibility and "an after-visit summary from [A.P.R.'s] current geneticist showing that genetic testing did not disprove the presence of a skeletal dysplasia." We do not disturb a ruling on a motion for new trial "except on a manifest and unmistakable abuse of [the court's] discretion." (*Develop-Amatic Engineering v. Republic Mortgage Co.* (1970) 12 Cal.App.3d 143, 151.)

To start, Father waived this point because, despite citing the general law governing motions for new trial, he failed to explain "with reasoned argument" why the additional evidence warranted a new trial. (*Badie, supra,* 67 Cal.App.4th at pp. 784-785.)

Regardless, the cited evidence does not show the trial court unmistakably abused its discretion when it denied a new trial. Because we agree that the record indicates that A.P.R. has not tested negative for all known forms of skeletal dysplasia and instead view the trial court's statement to mean that A.P.R. has not tested positive for this condition, the after-visit summary does not undermine the ultimate findings or order. The only other new post-trial evidence that Father offered was a declaration from a patient with no connection to this case who accused Nunes of "making false accusations and being dishonest in the medical records." That evidence goes to Nunes' credibility. For the reasons discussed above, we do not reassess witness credibility on appeal. Therefore, the trial court did not abuse its discretion by denying the motion for new trial.

In light of this conclusion, we deny Father's opposed motion to augment the record with documents related to the legal custody issue and Nunes' credibility, as substantial evidence already in the appellate record supports the trial court's findings and order on legal custody and any implied credibility finding about Nunes.

*    *    *

Rather than demonstrating abuse, Father essentially disagrees with the trial court's factual findings and determination of what served A.P.R.'s best interest in terms of medical decisions about his short stature. On appeal, Father reargues facts favorable to his trial positions. We acknowledge Father's strong beliefs stem from a desire to "know what's going on" in case A.P.R. experiences any future health issues. But it is not our role to reweigh the evidence or decide witness credibility anew. (*Babick*, *supra*, 229 Cal.App.4th at p. 1246.) Substantial evidence supports the trial court's findings and its order advances A.P.R.'s best interest, and thus we find no abuse of discretion.

D.

Turning to the court-ordered counseling, Father disputes that the trial court complied with Family Code section 3190. He argues that the trial court did not provide the reasons why it found the section 3190 criteria met and "failed to limit the therapy order to one year as is statutorily required." We conclude that the trial court set forth the required findings in the statement of decision but its order exceeded section 3190's time limit.

The court may "require" parents and minor children to participate in mental health counseling. (Fam. Code, § 3190, subd. (a).) Before issuing such an order, the court must find and "set forth reasons why" it found that: (1) the dispute poses a "substantial danger" to the best interest of the child;

19

(2) the counseling is in the best interest of the child; and (3) the financial burden created by court-ordered counseling does not "otherwise jeopardize" a party's other financial obligations.  (*Id.*, subd. (d).)

Although the trial court did not expressly invoke section 3190, its statement of decision contains the required findings.  First, it found that the parents' "domestic battling" imposes a substantial danger to A.P.R. because he "is old enough to be aware that his parents do not get along" and the tension is currently "impacting" him and "may have lasting consequences" on him.  Second, the trial court found that counseling would best serve A.P.R.'s interests because it will focus on "helping [A.P.R.] adjust to his emotional state and his parents' high conflict parenting" and his parents' therapy "may give each an insight into better ways to talk to one another about [A.P.R.]."  Third, the court's findings implicitly include that the counseling's financial obligation will not jeopardize the parents.  The court noted that Father pays "significant private school tuition" and is a "much higher income earner" than Mother, so therapy is less likely to overburden him financially.  The court ordered the parties to pay half of A.P.R.'s therapy costs "not covered by insurance," but directed Mother to select in-network therapists for A.P.R. ostensibly to keep the out-of-pocket costs down.  By doing so, it fixed the cost and apportioned it between the parties, a point that Father concedes. (§ 3190, subd. (c).)  Thus, the trial court made the section 3190 findings to support involuntary therapy.

The trial court, however, exceeded the time limit set by section 3190.  A court cannot require counseling to last "more than one year."  (§ 3190, subd. (a).)  The Legislature imposed an automatically expiring time limit as a "procedural safeguard" to involuntary counseling.  (*In re Katherine M.* (1994) 27 Cal.App.4th 91, 99-100.)  Here, the court did not set an end date for

20

A.P.R.'s therapy and committed Father and Mother to participate "until released by the therapist." An order that requires indefinite counseling "cannot stand." (*Id.* at p. 100.) Accordingly, we modify the judgment in the disposition below to correct this error.

E.

Lastly, Father accuses the trial court of violating due process by disregarding his "constitutional rights to privacy" and displaying prejudicial gender bias in favor of Mother. We address each point in turn.

First, Father claims that the trial court "penalized" him for purportedly asking Mother to abort her pregnancy. He does not explain how the passing reference in the statement of decision to Mother's testimony that Father suggested she "terminate" the pregnancy amounts to a state constitutional privacy violation. He therefore waives the point. (*Badie*, *supra*, 67 Cal.App.4th at pp. 784-785.) Nor, if we consider the merits, does Father explain how any aspect of the trial court's order hinged on that fact. The trial court mentioned it in the context of Mother's "initial reluctance to share parenting time," which it found "mostly resolved" by trial. Following trial, however, the court found that "both parents will foster frequent contact with the other." Consequently, the reference to abortion does not appear to have affected the trial court's move-away order.

Second, Father asserts that the trial court "engaged in gender bias." His due process claim of judicial bias is subject to an "exceptionally stringent standard," reaching reversable error only when " 'extreme facts' demonstrate a probability of actual bias." (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 588-589 (*Schmidt*).) For example, in *In re Marriage of Iverson* (1992) 11 Cal.App.4th 1495, 1502 (*Iverson*), gender bias "contaminated" the balance of the case. The court relied on gendered

stereotypes when it doubted the woman's testimony that her husband proposed to her because she was a "lovely" "girl" with "nothing going for her except for her physical attractiveness," and noted that a wealthy, less attractive man would not "buy the cow when you get the milk free." (*Id.* at pp. 1498-1500.)

Father does not identify similarly extreme instances of gender bias here. In his opening brief, he points to the trial court's findings about: (1) Mother's initial reluctance to share time with A.P.R. because Father asked her to terminate the pregnancy; (2) how Mother first hesitated about the flu shot, not out of "general hostility to vaccines," but because she wanted to know more as "a first-time mother"; (3) continuity of A.P.R.'s medical insurance; and (4) Mother's uncertainty about if and when Father may decide to stop paying A.P.R.'s "significant" private school tuition. We do not consider other examples first raised in reply and offered without explaining or providing legal authority as to why they show gender bias. (See *Raceway Ford Cases* (2016) 2 Cal.5th 161, 178; *Badie, supra*, 67 Cal.App.4th at pp. 784-785.) The findings we do consider reflect "[m]ere expressions of opinion" about the individuals in this case, "based on observation of the witnesses and evidence," and "do not demonstrate judicial bias." (*Schmidt, supra*, at p. 589.) Father—not the trial court—injects charged language to argue that these findings reflect a view of women generally and Mother specifically as "distraught," "less intelligent," "unable" to obtain medical care or "financially support herself," and "not strong" enough to "control [her] emotions." We do not see such an "outdated view of the female sex" in the parts of the record that Father cites or elsewhere in the record.

III.

We modify the judgment to limit the duration of the parties' and A.P.R.'s court-ordered therapy to one year. After issuance of the remittitur, neither the parties nor A.P.R. will be required to participate in therapy beyond one year absent a further order of the court. (See § 3190, subd. (e).) Nothing in this opinion shall preclude the parties from continuing to participate voluntarily in individual therapy or from jointly agreeing to voluntarily continue A.P.R.'s therapy or re-enroll him in therapy.

We affirm the judgment as modified above. The parties shall bear their own costs on appeal.

CASTILLO, J.

WE CONCUR:


HUFFMAN, Acting P. J.


BUCHANAN, J.

23